# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| BRYAN FAUBUS on behalf of himself and all others similarly situated, | Case No. |
| Plaintiff, | **CLASS ACTION COMPLAINT** |
| v. | Jury Trial Demanded |
| IFINEX INC.; BFXNA INC.; BFXWW INC.; TETHER HOLDINGS LIMITED; TETHER LIMITED; DIGFINEX INC.; TETHER OPERATIONS LIMITED; TETHER INTERNATIONAL LIMITED; AND JOHN DOES 1-50, | |
| Defendants. | |

Plaintiff Bryan Faubus, individually and on behalf of himself and all those similarly situated, as defined below, bring this class action against Defendants (defined below), based on publicly available materials, including a class action complaint, *Young et al, vs. Ifinex, Inc. et al*, 1:20-cv-000169 (filed January 8, 2020) (the "*Young* Action"),[1] and information and belief, and alleges as follows:

## NATURE OF THE ACTION

1.     During the period October 1, 2014 through and including the present (the "Class Period"), Tether Defendants issued and maintained a stablecoin known as Tether ("USD₮"), which is a digital token whose value is anchored to the U.S. dollar. Defendants claimed to have maintained a one-to-one reserve ratio between USD₮ and the U.S. dollar.

2.     At all relevant times, Tether Defendants maintained the exclusive ability to issue and remove USD₮, including the timing of USD₮ issuances and removals. During the Class Period, USD₮ remained the most used stablecoin in the world and the overwhelming majority of Bitcoin trading volume involved USD₮. While Tether Defendants' initial USD₮ issuance occurred in October 2014, Tether began issuing USD₮ more regularly and in greater volume in 2017 and 2018.

3.     During the Class Period, Defendants, through their unique control and access to printing USD₮, manipulated prices of Bitcoin by issuing USD₮ unbacked by a 1:1 U.S. dollar reserve and using the newly created USD₮ to purchase Bitcoin through U.S.-based cryptocurrency exchanges Bittrex and Poloniex. Defendants' unbacked printing of USD₮ artificially inflated the price of Bitcoin, which enabled Defendants to extract supra-competitive profits from Bitcoin traders. Specifically, the analysis in the *Young* Action ("Young's analysis")

---

[1] Counsel in this action has consulted with counsel in the *Young* Action prior to the filing of the complaint.

demonstrated that Bitcoin returns generally declined just before the USDŦ issuance dates and improved afterwards. Moreover, Defendants' inside information about USDŦ issuances enabled Defendants to sell Bitcoin once Bitcoin prices were artificially inflated, thus permitting Defendants to replenish Tether Defendants' U.S. dollar reserves.

4.     In addition, by manipulating the price of Bitcoin, Defendants necessarily manipulated the market for derivatives linked to Bitcoin, including Bitcoin futures traded on the Chicago Mercantile Exchange ("CME") and Chicago Board Options Exchange ("Cboe"). Bitcoin futures provide a wide variety of market participants the ability to gain exposure to Bitcoin and hedge Bitcoin price exposure.

5.     Bitcoin and Bitcoin futures prices run in parity, or lockstep, in the same direction. Pricing trends in the Bitcoin spot market directly impact Bitcoin futures prices. Bitcoin futures and Bitcoin futures traders necessarily rely on the spot prices of Bitcoin for price discovery and for assessing prices of Bitcoin futures. Given the lockstep price correlation between Bitcoin and Bitcoin futures prices, any increase or decrease in Bitcoin prices are immediately and correspondingly reflected in Bitcoin futures prices.

6.     As detailed herein, including through statistical analysis, Defendants' conduct resulted in artificial prices in Bitcoin and Bitcoin futures, throughout the Class Period, and otherwise harmed the legitimate forces of supply and demand in the Bitcoin market and related on-exchange market. The statistical evidence in Young's analysis further demonstrates that Defendants, their co-conspirators, and John Does 1-50 had the ability to cause artificial prices in Bitcoin and Bitcoin futures, and in fact caused artificial prices in Bitcoin and Bitcoin futures.

7.     Plaintiff has been injured by paying artificial and anticompetitive prices for Bitcoin as a direct and proximate result of Defendants' unlawful conduct alleged herein.

Plaintiff and other members of the Class were deprived of trading in a lawful competitive market for Bitcoin and Bitcoin futures during the Class Period and have been injured in their businesses and property.

8.      Plaintiff is a Bitcoin trader, and thus is best situated to bring claims on behalf of other traders of Bitcoin and Bitcoin futures.  The claims asserted by Plaintiff include various claims under the Commodity Exchange Act, the Sherman Act, and the Racketeer Influenced and Corrupt Organization Act ("RICO").  Plaintiff's claims are made on information and belief based on the investigation conducted by and under the supervision of Plaintiff's counsel.  That investigation included reviewing and analyzing information concerning Defendants and Bitcoin, which Plaintiff (through their counsel) obtained from, among other sources: (1) reports on the Bitcoin market; (2) pricing data for Bitcoin; (3) pricing data for Bitcoin futures; (5) publicly available press releases, news articles, and other media reports related to investigations into Bitcoin and Defendants; and (6) court filings Defendants and governmental entities made related to Defendants.

9.      Except as alleged in this complaint, neither Plaintiff nor other members of the public have access to the underlying facts relating to Defendants' improper conduct.  Rather, that information lies exclusively within the possession, custody, or control of Defendants, their co-conspirators, and John Does 1-50, which prevents Plaintiff from further detailing Defendants' misconduct.  Plaintiff believes further evidentiary support for their allegations will come to light after a reasonable opportunity for discovery.

**JURISDICTION, VENUE AND COMMERCE**

10.      This action arises under Section 2 of the Sherman Act (15 U.S.C. § 2), Sections 4 and 16 of the Clayton Act (15 U.S.C. §§ 15, 26), and Sections 2(a), 6(c), and 22 of the

Commodity Exchange Act ("CEA") (7 U.S.C. § 1 *et seq.*).  The action is for compensatory damages, treble damages, costs of suit, reasonable attorneys' fees, and such other relief as the Court may deem to be just and proper.

11.    This Court has federal question subject matter jurisdiction under 28 U.S.C. §§ 1331 and 1337, Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15, 26(a), Section 22 of the CEA, 7 U.S.C. § 25, and 18 U.S.C. § 1964(c) of RICO.

12.    This court has personal jurisdiction over Defendants, as each Defendant transacted business, commerce, and trading in the U.S. and in this District during the periods of price manipulation alleged herein.  Each Defendant also has substantial contacts within the U.S., including in this District, and engaged in multiple acts in furtherance of its conspiracy in the U.S., including in this District.  Defendants, therefore, should have foreseen the possibility of being brought before this Court as a result of Defendants' wrongful conduct.

13.    Venue is proper in this District, pursuant to, among other statutes, Section 22 of the CEA, 7 U.S.C. § 25(c), 15 U.S.C. § 22, 28 U.S.C. § 1391(b), (c), and (d), and Section 1965 of RICO (18 U.S.C. § 1965).  At all times, Defendants transacted in this District and a substantial part of the events giving rise to the claims asserted herein occurred in this District.

14.    Defendants made use of the means and instrumentalities of interstate commerce, including interstate wires, in connection with Defendants' unlawful acts and practices and courses of business alleged in this Complaint.  Defendants' monopolization and anticompetitive conduct were within the flow of the interstate commerce of the United States and were intended to, and did, in fact, have a substantial effect on the interstate commerce of the United States. Defendants' conspiracy and Defendants' overt acts taken in furtherance of it, were directed at,

and had the intended effect of, causing injury to persons residing in, located in, or doing business in the United States, including in this District.

PARTIES

I.      PLAINTIFF

15.     Plaintiff Bryan Faubus was at all times a resident of the State of New York. Plaintiff transacted in Bitcoin during the Class Period at artificial prices.

16.     Because of Defendants' monopolization and anticompetitive conduct described in this Complaint, Plaintiff suffered damages from a manipulated Bitcoin and Bitcoin futures market.

II.     DEFENDANTS

A.      iFinex Inc.

17.     Defendant iFinex Inc. ("iFinex") is a corporation organized under the laws of the British Virgin Islands with its principal place of business located at Suite 13/F, 1308 Bank of America Tower, 12 Harcourt Road Central, Hong Kong.

18.     Defendant iFinex Inc. wholly owns Defendants Bitfinex.[2]  During the Class Period, Defendant Bitfinex and the Tether Defendants shared a unity of corporate interest, with shared management[3] and investors, and operated as part of a single enterprise in furtherance of a monopolization that was directed at, and had the intended effect of, causing injury to persons residing in, located in, or doing business in the United States, including in this District.

B.      Bitfinex

19.     Defendants BFXNA Inc. ("BFXNA") and BFXWW Inc. ("BFXWW")

---

[2] Aff. of Brian M. Whitehurst at ¶ 8, *In the Matter of the Inquiry vs. iFinex Inc., et al.*, Index No. 450545/2019 (N.Y. Sup. Ct., N.Y. County July 8, 2019), NYSCEF No. 1.

[3] For example, Tether and Bitfinex shared the same chief executive officer, chief financial officer, and general counsel.

(collectively, "Bitfinex") are incorporated under the laws of the British Virgin Islands with their principal place of business located at Suite 13/F, 1308 Bank of America Tower, 12 Harcourt Road Central, Hong Kong.

20.     Together, BFXNA and BFXWW operate the online cryptocurrency exchange called "Bitfinex,"[4] with BFXNA contracting with U.S.-based customers and BFXWW contracting with non-U.S.-based customers.[5]

21.     Bitfinex Defendants are wholly owned subsidiaries of Defendant iFinex Inc.

**C.     DigFinex**

22.     Defendant DigFinex Inc. ("DigFinex") is a corporation organized under the laws of the British Virgin Islands with its principal place of business located at Jayla Place Wickhams Cay 1, Road Town, Tortola, British Virgin Islands.[6]

23.     DigFinex is the ultimate parent company and majority owner of Tether and iFinex,[7] and is operated by the same individuals that own and operate Bitfinex and Tether.[8]

**D.     Tether**

24.     Defendant Tether Holdings Limited is a corporation organized under the laws of the British Virgin Islands with its principal place of business located at 17F-1, No. 266 Sec. 1, Wenhua Road., Banqiao District, New Taipei City, Taiwan 22041.

25.     Defendant Tether Limited, a wholly owned subsidiary of Tether Holdings Limited, is a corporation organized under the laws of Hong Kong and headquartered in Taiwan.

---

[4] Aff. of Brian M. Whitehurst at ¶ 10, *In the Matter of the Inquiry vs. iFinex Inc., et al.*, Index No. 450545/2019 (N.Y. Sup. Ct., N.Y. County July 8, 2019), NYSCEF No. 1.

[5] *Id.* at ¶ 7.

[6] Aff. of Brian M. Whitehurst at Ex. M, *In the Matter of the Inquiry vs. iFinex Inc., et al.*, Index No. 450545/2019 (N.Y. Sup. Ct., N.Y. County July 8, 2019), NYSCEF No. 94.

[7] Aff. of Brian M. Whitehurst at ¶ 16, *In the Matter of the Inquiry vs. iFinex Inc., et al.*, Index No. 450545/2019 (N.Y. Sup. Ct., N.Y. County July 8, 2019), NYSCEF No. 1.

[8] *Id.* at ¶ 88.

26.     Defendant Tether Operations Limited, a wholly owned subsidiary of Tether Holdings Limited, is a corporation organized under the laws of Hong Kong.  Tether Operations Limited is responsible for processing trades made by Tether's U.S.-based investors.

27.     Defendant Tether International Limited, a wholly owned subsidiary of Tether Holdings Limited, is a corporation organized under the laws of Hong Kong.  Tether International Limited is responsible for processing Tether's non-U.S.-based investors.

28.     Defendants Tether Holdings Limited, Tether Limited, Tether Operations Limited, and Tether International Limited are collectively referred to as "Tether" or the "Tether Defendants."

29.     Tether Defendants are majority owned by Defendant DigFinex and is operated by the same individuals that own and operate iFinex and DigFinex, which together operated an enterprise that controlled the issuance of USDT.[9]  Specifically, Ludovicus Jan van der Velde and Giancarlo Devasini are directors and owners of Defendants DigFinex, iFinex, and Tether.[10]

**E.     John Does 1-50**

30.     Defendants John Does 1-50 are persons and entities, financial institutions, and/or trading firms that directly or indirectly participated in the manipulation and anticompetitive conduct in connection with Bitcoin and the Bitcoin futures market, as described herein.

31.     The identity of individuals and firms that trade Bitcoin and/or Bitcoin CME or Cboe futures is anonymous and not available to the public.  Plaintiff will be able to identify the John Doe Defendants through discovery of various cryptocurrency exchanges and trading records in possession of the CME Group Inc. that it is required to be maintained under the CEA including, but not limited to, cleared, executed trade data, audit trail data, Order Entry Operator

---

[9] *Id.* at ¶ 16.

[10] *Id.* at Ex. K.

identifications, Tag 50 IDs, User Assigned IDs, and Clearing Information.

### F.  Agents and Affiliates

32.  The defined term "Defendants," as used herein, includes each of the named Defendant's predecessors, successors, parents, wholly owned or controlled subsidiaries, and/or affiliates, employees, officers, and directors.

33.  Whenever reference is made to any act, deed, or transaction of any corporation, the allegation means that the corporation engaged in the act, deed, or transaction by or through its officers, directors, agents, employees, representatives, parents, predecessors, or successors-in-interest while they were actually engaged in the management, direction, control, or transaction of business or affairs of the corporation.

34.  Each named Defendant herein acted as the agent of, or participated in a joint venture for, all other Defendants with respect to the acts, violations, and common course of the conduct alleged herein.

**SUBSTANTIVE ALLEGATIONS**

**I.      OVERVIEW OF THE BITCOIN MARKET**

**A.      Overview of Bitfinex and USD₮**

35.      Virtual currencies, also known as cryptocurrencies, are digital assets that are used as a medium of exchange.  The overwhelming majority of cryptocurrencies trade on a centralized exchange[11] known as cryptocurrency exchanges, which seek to match buyers and sellers of a virtual currency.  Bitcoin ("BTC") is currently the world's most highly valued, widely traded, and liquid cryptocurrency.[12]  Figure 1 below depicts the trading volume of Bitcoin in 2017 and 2018 on four (4) cryptocurrency exchanges: Bittrex, Coinbase, Gemini, and Kraken.

**Figure 1 – Trading Volume of Bitcoin Between 2017 and 2018**



36.      In 2014, Defendant Tether Limited launched a blockchain-enabled digital token called tether, which Defendant Tether Limited purports to be backed by fiat currencies, such as

---

[11] *Tether: Fiat Currencies on the Bitcoin Blockchain*, Tether, https://tether.to/wp-content/uploads/2016/06/TetherWhitePaper.pdf (last visited Nov. 21, 2019).

[12] *CME Submission No. 17-417*, CME Group, (Dec. 1, 2017), https://www.cmegroup.com/content/dam/cmegroup/market-regulation/rule-filings/2017/12/17-417.pdf.

the U.S. dollar, held in Defendant Tether Limited's reserve bank accounts. Tether backed by the U.S. dollar is known as USD₮, whereas tether backed by the Euro is known as EURT. At all relevant times, Tether Defendants claimed to have maintained a one-to-one reserve ratio between the digital token and the associated fiat currency.[13]

37.     Tether Defendants purport that one tether USD₮ equals one U.S. dollar. USD₮ is known as a "stablecoin," which is a digital token whose value is anchored to the value of the fiat currency. As of October 2019, USD₮ is arguably "the most important coin in the crypto ecosystem" with monthly trading volume approximately 18% greater than Bitcoin.[14]

38.     Prior to late February 2019, Tether Defendants publicly stated on its website that "[e]very tether [USD₮] is always backed 1-to-1, by traditional currency held in our reserves. So 1 USD₮ is always equivalent to 1 USD."[15]

39.     Similarly, Tether Defendants' whitepaper regarding fiat currencies on the Bitcoin blockchain stated that each USD₮ is fully "backed" by one U.S. dollar[16] and that "[a]t any given time the balance of fiat currency held in our reserves will be equal to (or greater than) the number of tethers in circulation."[17] Tether Defendants' whitepaper further notes that, "each tetherUSD in circulation represents one US dollar held in our reserves (i.e. a one-to-one ratio) which means the system is fully reserved when the sum of all tethers in existence (at any point in time) is exactly equal to the balance of USD held in our reserve."[18]

---

[13] *Tether: Fiat Currencies on the Bitcoin Blockchain*, *supra* note 10.

[14] Olga Kharif, *The World's Most-Used Cryptocurrency Isn't Bitcoin*, Bloomberg (Sept. 30, 2019), https://www.bloomberg.com/news/articles/2019-10-01/tether-not-bitcoin-likely-the-world-s-most-used-cryptocurrency.

[15] Tether.to (Jan. 17, 2019), https://web.archive.org/web/20190117041854/https://tether.to/.

[16] Jeff Wise, *Is the Price of Bitcoin Based on Anything at All?*, Medium (Aug. 22, 2018), https://medium.com/s/story/is-the-price-of-bitcoin-based-on-anything-at-all-8989790678e9.

[17] *Tether: Fiat currencies on the Bitcoin Blockchain*, *supra* note 10.

[18] *Tether: Fiat currencies on the Bitcoin Blockchain*, *supra* note 10, at 9.

40.     As of March 4, 2019, Tether Defendants amended its description of USD₮ to state that USD₮ is "backed by our reserves."[19]

41.     Each USD₮ transaction contains the intermediary wallet IDs of the sender and recipient, usually delineated by a string of 34 characters and numbers.  These digital wallet IDs permit users to send, receive, and transact in Bitcoin and other virtual currencies.  Tether Defendants publicly report a "richlist" of digital wallets of the tether blockchain.[20]  In addition, the Omniexplorer, an online repository of all confirmed USD₮ transactions, maintains a listing of digital wallets assigned to the tether blockchain.

42.     According to counsel for Tether Defendants, Tether issues USD₮s when an investor requests to purchase USD₮s by depositing U.S. dollars with Tether Defendants or another trading platform authorized to accept dollar deposits in exchange for USD₮s.[21]

43.     Once Tether Defendants issue USD₮s, those USD₮s are transferred from Tether's "treasury wallet" directly to Bitfinex.  At all times, Tether Defendants maintain control over Tether's "treasury wallet."  After the Tether Defendants transfer the newly issued USD₮s to Bitfinex, they are transferred to one of several exchanges, with nearly two-thirds of the USD₮s transferred to U.S.-based exchanges Bittrex and Poloniex.

44.     Given Tether's integral role with Bitcoin transactions, it is essential that Tether Defendants maintain sufficient U.S. dollar reserves on hand in order to execute withdrawal orders from customers.  At all times during the Class Period, USD₮ was the main stablecoin by which other cryptocurrencies were priced, including Bitcoin.[22]

---

[19] *FAQs*, Tether, https://tether.to/faqs/ (last visited Nov. 21, 2019).

[20] *See Rich List*, Tether, https://wallet.tether.to/richlist (last visited Nov. 21, 2019).

[21] Aff. of Brian M. Whitehurst at ¶ 34, *In the Matter of the Inquiry vs. iFinex Inc., et al.*, Index No. 450545/2019 (N.Y. Sup. Ct., N.Y. County Apr. 25, 2019), NYSCEF No. 1.

[22] *See Is the Price of Bitcoin based on Anything At All?*, *supra* note 15.

45.     During the Class Period, Tether Defendants' USD₮ supply was significantly larger than any other stablecoin.  For example, in October 2018, Tether was nearly five times larger than the next five stablecoins combined and accounted for approximately 84% of the total supply of stablecoins on the Omni Layer Protocol.  The approximate remaining percentage of stablecoins collectively were accounted for by Circle USDC ("USDC"), Maker Dai ("DAI"), Paxos Standard ("PAX"), and TrustToken TrueUSD ("TUSD").[23]  Figures 2 and 3 below detail the total supply by stablecoin as of October 2018.

**Figure 2 – Omni Layer Protocol Supply by Stablecoin[24]**

| Stablecoin | Ticker | Total Supply |
|---|---|---|
| Tether (Omni) | USDT | 2,122,371,227 |
| TrustToken TrueUSD | TUSD | 158,423,199 |
| Paxos Standard | PAX | 76,250,245 |
| Maker Dai | DAI | 62,947,751 |
| Tether (ERC20) | USDT | 60,109,502 |
| Circle USDC | USDC | 33,567,894 |
| Gemini Dollar | GUSD | 5,361,959 |

---

[23] Alex Vikati, *Tether vs Other Stablecoins*, Medium (Oct. 19, 2018), https://medium.com/@vikati/tether-vs-other-stablecoins-96b6846a9b7.

[24] *Id.*

**Figure 3 – Omni Layer Protocol Supply by Stablecoin[25]**



46.     Tether was nearly five times larger than the next five stablecoins combined and accounted for approximately 84% of the total supply of stablecoins on the Omni Layer Protocol.

47.     Moreover, during the Class Period, the overwhelming majority of total volume transacted involving Bitcoin was done through USD₮.  For example, as of September 2019, approximately 70.95% of all total monthly Bitcoin volume traded into fiat or stablecoin was executed using USD₮.  Figure 4 below details the proportion of total monthly Bitcoin trading into different fiat currencies and stablecoin as of September 2019.

---

[25] *Id.*

**Figure 4 – Total Monthly Bitcoin Trading into Fiat or Stablecoins Between July and September 2019[26]**



48.     As of September 2019, USD₮ remained the most used stablecoin in the world.[27] During the Class Period, the majority of Tether Defendants' USD₮ issuances were routed through related entity Bitfinex, a fiat-to-cryptocurrency exchange owned and operated by Defendant iFinex, the owner of Tether.   In turn, nearly two-thirds of Tether Defendants' issuances routed through Defendant Bitfinex flowed through U.S.-based cryptocurrency exchanges Bittrex and Poloniex.   Founded in 2012, Bitfinex is the "world's largest exchange by volume for trading Bitcoin against the US Dollar."[28]   Through Bitfinex, customers can deposit, trade, and withdraw various cryptocurrencies such as Bitcoin and Ethereum.   Bitfinex earns revenue by charging investors a transaction fee for all trades on its platform.[29]

49.     In addition, Bitfinex is a fiat-to-crypto exchange, meaning that customers could

---

[26] *Exchange Review September 2019*, CryptoCompare, https://www.cryptocompare.com/media/35651687/cryptocompare_exchange_review_2019_09.pdf?blog.

[27] Kharif, *supra* note 13.

[28] *What is Bitfinex*, Bitfinex, https://support.bitfinex.com/hc/en-us/articles/213892209-What-is-Bitfinex- (last visited Nov. 21, 2019).

[29] *Id.*

deposit and withdraw U.S. dollars, euros, pounds, and yen.[30]  These deposits can then be stored or exchanged for USD₮ or cryptocurrencies, such as Bitcoin.  Once a customer makes a deposit, Tether Limited issues USD₮s.  At all relevant times, Tether Defendants maintained the exclusive right to issue or remove USD₮ from the market.[31]

50.     Prior to August 2017, Bitfinex had little or no restrictions on whether U.S.-based investors could access Bitfinex's trading platform, which meant that U.S.-based investors were able to create and fund accounts, trade, and withdraw funds.[32]  In August 2017, Bitfinex began to restrict U.S.-based individual investors' access to trading on Bitfinex, thus preventing them from trading, creating accounts, and withdrawing funds.[33]  However, Bitfinex continued to permit U.S.-based business entities access to Bitfinex until approximately August 2018.[34]  Tether's Terms of Service did not specifically prohibit redemption of tether by U.S.-based individuals or business entities until November 2018.[35]

51.     In addition, despite Bitfinex's restrictions on U.S.-based investors, documents obtained by the State of New York Office of the Attorney General ("OAG") revealed that Bitfinex still permitted customers located in New York to continue to transact on Bitfinex.[36]  Moreover, the documents obtained by the New York OAG demonstrate that Defendants knowingly flouted restrictions intended to preclude U.S.-based investors from accessing and transacting on Bitfinex.

---

[30] Aff. of Brian M. Whitehurst at ¶ 23, *In the Matter of the Inquiry vs. iFinex Inc., et al.*, Index No. 450545/2019 (N.Y. Sup. Ct., N.Y. County Apr. 25, 2019), NYSCEF No. 1

[31] *Id.* at ¶ 34.

[32] *Id.* at ¶ 24.

[33] *Id*.

[34] *Id*.

[35] Aff. of Brian M. Whitehurst at ¶ 16, *In the Matter of the Inquiry vs. iFinex Inc., et al.*, Index No. 450545/2019 (N.Y. Sup. Ct., N.Y. County July 8, 2019), NYSCEF No. 81.

[36] *Id.* at ¶ 9.

52.     For example, in an e-mail dated January 24, 2018, Giancarlo Devasini, the Chief Financial Officer of Bitfinex,[37] wrote to a U.S.-based Bitfinex customer and Jeffrey Wallis, an employee of Noble Bank Ltd., a bank that Bitfinex and Tether Limited used at the time, "Jeffrey: please take good care of [REDACTED], he's a very good customer of ours.  You guys are both in New York and I think you should meet[.]"[38]  The document demonstrates that Bitfinex's CFO knew that a U.S.-based customer was accessing Bitfinex in contravention of Bitfinex's stated terms of service, which prohibited U.S.-based individual investors from accessing and trading on Bitfinex as of August 2017.

53.     Similarly, in another e-mail dated January 24, 2018, Giancarlo Devasini sent an e-mail to Paola Ardoino, Chief Technology Officer at Bitfinex, Bjorn De Wolf, Customer Support Manager at Bitfinex, and Philip Potter, Chief Strategy Officer at Bifinex, and a U.S.-based Bitfinex customer.[39]  Mr. Devasini wrote, "Guys please meet [REDACTED], our main contact at [REDACTED], big trading company in New York."[40]  Mr. Devasini also noted that "Phil Potter . . . will be glad to help you with anything related to your trading activity" and that "Bjorn De Wolf . . . will help you with green-laning your addresses for a faster confirmation of your coin withdrawals."[41]

54.     This e-mail clearly demonstrates that multiple senior executives at Bitfinex not only knew that U.S.-based customers were accessing Bitfinex, in violation of Bitfinex's stated terms of service, but that Bitfinex senior executives, including the Chief Strategy Officer, Chief

---

[37] *Id*. at ¶ 37.

[38] Aff. of Brian M. Whitehurst at Ex. D, *In the Matter of the Inquiry vs. iFinex Inc., et al.*, Index No. 450545/2019 (N.Y. Sup. Ct., N.Y. County July 8, 2019), NYSCEF No. 85.

[39] Aff. of Brian M. Whitehurst at Ex. E, *In the Matter of the Inquiry vs. iFinex Inc., et al.*, Index No. 450545/2019 (N.Y. Sup. Ct., N.Y. County July 8, 2019), NYSCEF No. 86.

[40] *Id*.

[41] *Id*.

Financial Officer, and Chief Technology Officer, were willing to aid and abet a U.S.-based investor's trading activities in violations of Bitfinex's stated terms of service.

55.     Defendants' brazen disregard for Bitfinex's stated terms of service, namely in permitting U.S.-based investors access to trade on Bitfinex, continued well into 2018 and 2019. In October 2018, Defendants "onboarded"[42]  Galaxy Digital L.P., a U.S.-based trading firm located at 107 Grand Street in New York, New York, and its associated entities, to trade on Bitfinex.[43]  Moreover, the correspondence between Bitfinex and Galaxy clearly notes that the address for Galaxy Digital L.P. was located in New York.[44]  Defendants knew, or should have known, that Galaxy Digital L.P. and its associated entities were U.S.-based investors, and yet Defendants disregarded Bitfinex's stated terms of service to permit Galaxy Digital L.P. to access Bitfinex.

56.     Similarly, the New York OAG obtained documents from Defendants indicating that the "verification" of a trader on Bitfinex clearly notes that the trader resides in, and traded from, the State of New York.[45]  Other documents obtained by the New York OAG reveal that Defendants knew that hundreds of U.S.-based customers were trading and accessing Bitfinex from the United States from November 7, 2017 through May 4, 2019.[46]

57.     In addition, the New York OAG noted that Bitfinex permitted "unverified" users (*i.e.*, users for whom Bitfinex did not have personal identifying information to confirm the

---

[42] "On-boarding" refers to the process of creating and verifying an account to execute transactions on a cryptocurrency exchange.  *See Virtual Markets Integrity Initiative*, Office of the New York State Attorney General (Sept. 18, 2018), https://virtualmarkets.ag.ny.gov.

[43] Aff. of Brian M. Whitehurst at Ex. H, *In the Matter of the Inquiry vs. iFinex Inc., et al.*, Index No. 450545/2019 (N.Y. Sup. Ct., N.Y. County July 8, 2019), NYSCEF No. 89.

[44] *Id.*

[45] Aff. of Brian M. Whitehurst at Ex. I, *In the Matter of the Inquiry vs. iFinex Inc., et al.*, Index No. 450545/2019 (N.Y. Sup. Ct., N.Y. County July 8, 2019), NYSCEF No. 90.

[46] Aff. of Brian M. Whitehurst at ¶¶ 13-14, *In the Matter of the Inquiry vs. iFinex Inc., et al.*, Index No. 450545/2019 (N.Y. Sup. Ct., N.Y. County July 8, 2019), NYSCEF No. 81.

identify or location of the user) to access Bitfinex.[47]  Bitfinex users were not required to "submit

a range of personal identifying information" or "government-issued identification" in order to

trade.[48]  Rather, Bitfinex required "little more than an email address to begin trading virtual

currencies."[49]   These "unverified" users were able to purchase, sell, and exchange

cryptocurrencies on Bitfinex.[50]

58.    Collectively, these documents and e-mails show that Defendants' restrictions for

U.S.-based investors were spurious and were not enforced in any manner throughout the Class

Period.  Defendants lack of restrictions, and open ignorance of prior restrictions, meant that at all

times during the Class Period, U.S.-based investors had access to Bitfinex, including creating,

funding, trading, and withdrawing funds.

59.    Executives and senior management for Defendants DigFinex, Bitfinex, iFinex,

and Tether regularly conducted corporate activities from within the United States.  Documents

obtained by the New York OAG reveal that one of Defendant DigFinex's largest shareholders,

Phil Potter, Chief Strategy Officer at Bitfinex, conducted corporative activities and resided in

New York.

60.    Phil Potter was a key executive conducting business on behalf of Defendants

DigFinex, iFinex, and Tether.  Giancarlo Devasini noted on January 24, 2018, that Phil Potter

"lives in New York" and that he would "be glad to help you [U.S.-based customer] with anything

---

[47] *Id.* at ¶ 51.

[48] *Virtual Markets Integrity Initiative*, Office of the New York State Attorney General (Sept. 18, 2018),
https://virtualmarkets.ag.ny.gov.

[49] *Id.*

[50] Aff. of Brian M. Whitehurst at ¶ 51, *In the Matter of the Inquiry vs. iFinex Inc., et al.*, Index No. 450545/2019
(N.Y. Sup. Ct., N.Y. County July 8, 2019), NYSCEF No. 81.

related to your trading activity."[51]   Moreover, in an internet-based interview, Giancarlo Devasini

acknowledged that "Phil . . . has a big contribution [] in the decision making."[52]

61.    For example, in December 2017, Defendants DigFinex, iFinex Inc., and Tether

Holding Limited, at the initiation of Phil Potter, opened business bank accounts at New

York-based Metropolitan Commercial Bank and proceeded to transact in those accounts

thereafter.[53]   The various letters from Metropolitan Commercial Bank demonstrate that Potter

transacted substantial amounts of business activities on behalf of Defendants iFinex Inc. and

Tether Holding Limited within the United States.

62.    In February 2018, Potter opened business accounts for Defendants DigFinex,

iFinex Inc., and Tether Holding Limited with Signature Bank, a New York-based bank, and

proceeded to transact in those accounts until at least April 2018.[54]   These transactions and the

creation of the accounts were executed at the direction of Phil Potter[55] from the United States.

63.    The documents obtained by the New York OAG evidence that Potter conducted

significant transactions on behalf of Defendants from within the United States.   Defendants

DigFinex, iFinex Inc., and Tether Holding Limited, through Potter, made a multi-million-dollar

Series A investment in Noble Talents LLC, which was operated by Noble executives from New

---

[51] Aff. of Brian M. Whitehurst at Ex. M, *In the Matter of the Inquiry vs. iFinex Inc., et al.*, Index No. 450545/2019
(N.Y. Sup. Ct., N.Y. County July 8, 2019), NYSCEF No. 94.

[52] Bitfinex'ed, *The Audio Recording Bitfinex Doesn't Want You to Hear*, Medium (Feb. 7, 2018),
https://medium.com/@bitfinexed/the-audio-recordings-bitfinex-doesnt-want-you-to-hear-44d677cf1094.

[53] Aff. of Brian M. Whitehurst at Ex. M, *In the Matter of the Inquiry vs. iFinex Inc., et al.*, Index No. 450545/2019
(N.Y. Sup. Ct., N.Y. County July 8, 2019), NYSCEF No. 94.

[54] Aff. of Brian M. Whitehurst at ¶¶ 25-26, *In the Matter of the Inquiry vs. iFinex Inc., et al.*, Index No. 450545/2019
(N.Y. Sup. Ct., N.Y. County July 8, 2019), NYSCEF No. 81.

[55] Aff. of Brian M. Whitehurst at Ex. N, *In the Matter of the Inquiry vs. iFinex Inc., et al.*, Index No. 450545/2019
(N.Y. Sup. Ct., N.Y. County July 8, 2019), NYSCEF No. 95.

York.[56]   Specifically, an e-mail from Phil Potter, dated December 4, 2017, to personnel associated with Noble Bank indicate that Potter made strategic decisions stating, "[p]er my discussion with John today, we are back on for a $2 million investment in the Series A round."[57]

64.    In addition, documents obtained by the New York OAG reveal that in 2017 Defendant Bitfinex entered into a "sponsored pool agreement" with Noble Bank and a third-party virtual currency trading firm containing a forum-selection clause selecting the United States as the forum.[58]  Specifically, the forum-selection clause states: "[b]ut, for the convenience of the parties any and all disputes hereunder shall be resolved exclusively in state or federal courts within the State of New York in the Borough of Manhattan and the parties hereby accept the existence of personal jurisdiction over them in such jurisdiction and agree not to assert that any such court in the Borough of Manhattan is an inconvenient forum."[59]  Defendant Bitfinex executed the sponsored pool agreement consenting to jurisdiction in the United States, specifically New York.[60]

65.    Additional documentation obtained by the New York OAG demonstrates that Defendants iFinex Inc. and Tether Holding Limited contracted with several vendors, including a New York-based public relations firm, and conducted meetings and operations from the United States.[61]   On December 1, 2017, Defendant Bitfinex announced that it had retained

---

[56] Aff. of Brian M. Whitehurst at ¶¶ 27-29, *In the Matter of the Inquiry vs. iFinex Inc., et al.*, Index No. 450545/2019 (N.Y. Sup. Ct., N.Y. County July 8, 2019), NYSCEF No. 81.

[57] Aff. of Brian M. Whitehurst at Ex. O, *In the Matter of the Inquiry vs. iFinex Inc., et al.*, Index No. 450545/2019 (N.Y. Sup. Ct., N.Y. County July 8, 2019), NYSCEF No. 96.

[58] Aff. of Brian M. Whitehurst at Ex. Q, *In the Matter of the Inquiry vs. iFinex Inc., et al.*, Index No. 450545/2019 (N.Y. Sup. Ct., N.Y. County July 8, 2019), NYSCEF No. 98.

[59] *Id.*

[60] *Id.*

[61] Aff. of Brian M. Whitehurst at ¶ 53, *In the Matter of the Inquiry vs. iFinex Inc., et al.*, Index No. 450545/2019 (N.Y. Sup. Ct., N.Y. County July 8, 2019), NYSCEF No. 81.

New York-based public relations firm 5W Public Relations regarding its operations.[62]  An e-mail obtained by the New York OAG reveals that Bitfinex's general counsel, Stuart Hoegner, requested to meet in person with employees from 5W Public Relations in New York in November 2017 to address skepticism expressed by market participants regarding Tether Holding Limited's cash reserves.[63]  Specifically, Stuart Hoegner wrote, "I have an early meeting in D.C. on Monday.  If you have some time, we can get together for as long as you want in New York late on Monday afternoon.  Looks like I can be in midtown by about a quarter to 4.  Could we get together at 4pm for as long as you want?"[64]  Collectively, these documents demonstrate that Defendants targeted investors, conducted and directed corporate business, retained domestic vendors, and addressed concerns from market participants all from within the United States.

### B.      History of USD₮ Issuances

66.      While the first USD₮ was issued on October 6, 2014,[65] Tether Limited began issuing USD₮ on a more regular basis in the middle of 2016.  Figure 5 below illustrates Young's analysis of Tether Limited issuances of USD₮ as of May 2019.

---

[62] Aff. of Brian M. Whitehurst at Ex. V, *In the Matter of the Inquiry vs. iFinex Inc., et al.*, Index No. 450545/2019 (N.Y. Sup. Ct., N.Y. County July 8, 2019), NYSCEF No. 103

[63] Aff. of Brian M. Whitehurst at Ex. W, *In the Matter of the Inquiry vs. iFinex Inc., et al.*, Index No. 450545/2019 (N.Y. Sup. Ct., N.Y. County July 8, 2019), NYSCEF No. 104.

[64] *Id.*

[65] John M. Griffin & Amin Shams, *Is Bitcoin Really Un-Tethered?*, SSRN, at 12 (October 28, 2019), https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3195066.

**Figure 5 – Tether Issuance Dates and Issuance Amounts October 2014 through May 2019**



67.     As illustrated by Figure 5 above, the vast majority of Tether Defendants' USDⱦ

issuances occurred in 2017, when Bitcoin experienced a prolonged price bubble.

**Figure 6 – Tether Issuances and Amounts by Month Between
October 2014 through May 2019**



68.     Moreover, as demonstrated in Figure 6 above, the largest issuances of USDⱦ

occurred between November 2017 and January 2018, during which time the price of Bitcoin

increased nearly dramatically.  *See* Figure 7 below.

69.      Specifically, between January 2016 and December 2017, the price of Bitcoin jumped from $400 to a peak of $19,497 per Bitcoin on December 16, 2017.  Figure 7 below demonstrates the dramatic increase in Bitcoin prices in 2017, and the subsequent collapse in prices in 2018.

**Figure 7 – BTC/USD Exchange Rate between 2013 and 2019**



*Source: Coinmarketcap, Bloomberg*

70.      Whereas Tether Defendants' USD₮ issuances prior to November 2017 averaged less than 50,000,000 USD₮ per issuance, starting in November 2017, near the height of the Bitcoin price bubble, Tether Defendants' USD₮ issuances began to significantly increase, averaging no less than 100,000,000 USD₮ per issuance.

71.      Bitcoin prices peaked on December 16, 2017, at $19,497 per Bitcoin.[66]

72.      Young's analysis and research demonstrates that Tether Defendants' USD₮ issuances were used to purchase Bitcoin in large quantities following negative pricing returns, thereby reversing declining prices and stabilizing Bitcoin.

---

[66] *See* Figure 7.

73.     As of June 2019, Tether Limited has issued approximately $3.0 billion in USD₮ coins to date.   Tether's increase in USD₮ issuances is commensurate with the significant increase in daily Bitcoin and tether trading volumes.  *See* Figure 8 below.

**Figure 8 – Bitcoin & Tether Trading Volume, 2015 through May 2019**



*Source: Coinmarketcap, Bloomberg*

74.     During the Class Period, USD₮ became a major source of liquidity for Bitcoin transactions, accounting for upwards of 98.7% of the total Bitcoin trading in stablecoins. According to CryptoCompare,[67] for example, as of March 2019, "USD₮ represents 98.7% of the total Bitcoin trading" compared with the next four largest stablecoins.[68]  *See* Figure 9.

---

[67] Founded in 2014, "CryptoCompare is a central authority for clear and concise information, offering unrivalled breadth, scope and depth of data, bridging the gap between the crypto asset and traditional financial markets." *About Us*, CryptoCompare, https://www.cryptocompare.com/about-us/ (last visited Oct. 8, 2019).

[68] *Exchange Review March 2019*, CryptoCompare, 13, https://www.cryptocompare.com/media/35650390/cryptocompare_exchange_review_2019_03.pdf (last visited Oct. 8, 2019).

**Figure 9 – Proportion of BTC Trading into Top Stablecoins for January - March 2019**[69]



75.     Between May and July 2019, USDŦ proportion of Bitcoin trading into stablecoins was approximately 97%.[70]   Moreover, in a Bloomberg article, dated June 6, 2019, Bitfinex acknowledged USDŦ's dominance saying that tether accounts for 98.7% of trading volume.[71] Figure 10 below further demonstrates the monopoly that Tether Defendants hold over Bitcoin trading into stablecoins.

---

[69] *Id*.  The remaining stablecoins in Figure 9 are Maker Dai ("DAI"), Circle USDC ("USDC"), Paxos Standard ("PAX"), TrustToken TrueUSD ("TUSD"), and Gemini Dollar ("GUSD").

[70] *Exchange Review July 2019*, CryptoCompare, 21, https://www.cryptocompare.com/media/35651284/cryptocompare_exchange_review_2019_07.pdf (last visited Oct. 8, 2019).

[71] Kharif, *supra* note 13.

**Figure 10 – Proportion of BTC Trading into Top Stablecoins for May - July 2019**[72]



76.     Furthermore, the number of "active accounts" (*i.e.*, non-zero balance accounts) further illustrates the pivotal role that tether played in Bitcoin trading.   In October 2018, for example, tether maintained nearly 45 times the number of active accounts than rival stablecoins DAI, TUSD, PAX, GUSD, and USDC.[73]   Figure 11 below illustrates tether active accounts compared with other stablecoins.[74]

[72] *Id.*

[73] Vikati, *supra* note 22.

[74] Vikati, *supra* note 22.

**Figure 11 – Number of Holders by Stablecoin as of October 2019[75]**

| Stablecoin | Ticker | Number of Holders |
|---|---|---|
| Tether (Omni) | USDT | 469,242 |
| Maker Dai | DAI | 6,777 |
| TrustToken TrueUSD | TUSD | 2,767 |
| Tether (ERC20) | USDT | 1,935 |
| Paxos Standard | PAX | 373 |
| Gemini Dollar | GUSD | 310 |
| Circle USDC | USDC | 159 |

77.    Additionally, as of April 2019, Bitcoin trading into USD₮ represented approximately 80% of total volume traded into fiat or stablecoin, as detailed below in Figure 12.[76]  Throughout the Class Period, USD₮ dominated Bitcoin trading into fiat or stablecoin.[77]

---

[75] Vikati, *supra* note 22.

[76] Steven Ehrlich, *After an $850 Million Controversy, What Everyone Should Know about Fitfinex, Tether and Stablecoins*, Forbes (May 2, 2019, 9:09 a.m), https://www.forbes.com/sites/stevenehrlich/2019/05/02/after-an-850-million-controversy-what-everyone-should-know-about-bitfinex-tether-and-stablecoins/#4101ae81492f.

[77] *Exchange Review April 2019*, CryptoCompare, 10, https://www.cryptocompare.com/media/35650606/cryptocompare_exchange_review_2019_04.pdf (last visited Oct 8, 2019).

**Figure 12 – Proportion of Total Monthly Bitcoin Trading into Fiat or Stablecoins for February – April 2019**[78]



**Figure 13 – February through April 2019 Bitcoin Trading into Fiat or Stablecoins**[79]



## II.      DEFENDANTS MANIPULATED BITCOIN TO INCREASE TRADING PROFITS

### A.      Defendants Issued USD₮s to Inflate Bitcoin Prices

78.      Throughout the Class Period, Defendants had multiple motives to cause artificial increases and decreases in Bitcoin prices.  Defendants' control of Bitfinex and exclusive ability

---

[78] *Id*.  Fiat currencies include U.S. Dollar ("USD"), Euro ("EUR"), Japanese Yen ("JPY"), South Korean Won ("KRW"), Great British Pound ("GBP"), and Russian Ruble ("RUB").

[79] *Id*.

to print USD₮s through the USD₮ issuances gave Defendants the ability to manipulate Bitcoin prices and extract supra-competitive profits from Bitcoin traders.

79.     Upon information and belief, Defendants – along with most issuers of early cryptocurrencies – are "long" Bitcoin, meaning their positions will increase in value if the price of Bitcoin increases.[80]

80.     Philip G. Potter, Chief Strategy Officer at Bitfinex from February 2014 through June 2018,[81] for example, admitted on a live talk internet show on January 20, 2015 that he is "a long-term holder" of Bitcoin and that he has "a great deal of interest in Bitcoin."[82]   Potter elaborated that he has been "a trader all [his] life" and that he is "an investor in Bitcoin that will add to his position a little bit on the way down and sell a little bit on the way up."[83]   In addition to his personal trading, Philip Potter managed a Bitcoin arbitrage and New York-based hedge fund, Potter Ventures, LLC, while simultaneously working for Bitfinex.[84]

81.     Furthermore, Bitfinex Chief Financial Officer Giancarlo Devasini admitted that he has "over 1.2 million tokens" and that he kept "the vast majority of them on Bitfinex."[85]

82.     Similarly, Josh Rossi, then VP of Business Development at Bitfinex, admitted that other Bitfinex employees on the "management team" "definitely do hold and are bullish on

---

[80] Griffin & Shams, *supra* note 64, at 16.

[81] Matthew Leising, *Chief Strategy Officer of Bitfinex and Tether is Departing*, Bloomberg (June 22, 2018), https://www.bloomberg.com/news/articles/2018-06-22/chief-strategy-officer-of-bitfinex-and-tether-is-departing.

[82] Coinspeaker Staff, *Audio File & Written Transcript of Bitfinex's Philip Potter Trading Confession*, Coinspeaker (Jan. 25, 2015), https://www.coinspeaker.com/audio-file-written-transcript-of-phillip-potter-bitfinex-trading-confession/.

[83] *Id.*

[84] Bitfinex'ed, *Wash Trading Bitcoin Part II: Who and why is someone wash trading on Bitfinex?*, Medium (Oct. 22, 2017), https://medium.com/@bitfinexed/wash-trading-bitcoin-part-ii-who-and-why-is-someone-wash-trading-on-bitfinex-e1c7b5e0b3bb.

[85] *Id.*

bitcoin."[86]

83.     Despite Bitfinex employees having access to issuances, customer orders, flows, and other backend information on the exchange, Bitfinex does "not provide any restrictions on employee trading."[87]   Moreover, both the New York OAG and Bitfinex's own executive, Phil Potter, acknowledged that trading presents a "conflict of interest."[88]

84.     In a live internet interview, dated January 20, 2015, when asked whether Phil Potter thought there is a conflict of interest given that he had access to Bitfinex customer accounts, Phil Potter replied, "[t]here is of course a conflict of interest if I traded actively and I don't."[89]   Phil Potter would clarify that he is "an investor in Bitcoin that will add to his position a little bit on the way down and sell a little bit on the way up."[90]

85.     Similarly, the New York OAG noted that "[t]rading by platform employees poses a conflict of interest."[91]   The New York OAG wrote that this conflict of interest could be managed if platforms, including Bitfinex, "adopt[], and its employees adhere to, policies and procedures prohibiting employees from trading on the basis of information that gives them an advantage over customers – for instance, access to non-public news (like the impending listing of a new virtual currency on the platform), information about the status of the platform order book, or information about its customers' identities."[92]

86.     Defendants' holdings of Bitcoin create a conflict of interest and strong incentive

---

[86] Daniel Mark Harrison, *Bitfinex Scandal Erupts as Director Admits Trading While Maybe Seeing Customer Order*, Coinspeaker (Jan. 25, 2015), https://www.coinspeaker.com/bitfinex-scandal-erupts-as-director-admits-trading-while-seeing-customer-orders/.

[87] *Virtual Markets Integrity Initiative*, *supra* note 47.

[88] Coinspeaker Staff, *supra* note 81.

[89] *Id*.

[90] *Id.*

[91] *Virtual Markets Integrity Initiative*, *supra* note 47.

[92] *Id*.

to generate artificial demand to increase the price of Bitcoin and, in turn, the value of Defendants' holdings and those of the personal accounts of their employees. Moreover, the lack of any Bitfinex policies and procedures prohibiting employees from trading Bitcoin provides Defendants both non-public information and the means to manipulate Bitcoin prices.

87.    According to the Affirmation of Brian M. Whitehurst, Assistant Attorney General at the New York OAG, filed in the New York Supreme Court Action, Index No. 450545/2019, (NYSCEF No. 1), Tether's issuances of USD₮ were not in standard amounts or in consistently timed intervals. Rather, Tether's counsel represented that "issuances of new tether occur when an investor has requested to purchase tethers by depositing U.S. dollars with Tether the company, or by depositing U.S. dollars with a trading platform that is authorized to accept dollar deposits in exchange for tethers."[93]

88.    Young's analysis of Tether Limited's USD₮ issuances and the subsequent large USD₮ flow from Bitfinex to U.S. exchanges demonstrates a repeated "U-shaped" pattern in Bitcoin prices, evidencing manipulation of Bitcoin prices.[94] Young's analysis found that Bitcoin returns generally declined just before the USD₮ issuance dates and improved afterwards. This suggests that Defendants printed USD₮s to manipulate and support the price of Bitcoin upwards. The issuances reversed negative Bitcoin returns, enabling Defendants to enjoy supra-competitive profits at the expense of Plaintiff and other purchasers of Bitcoin and Bitcoin futures. *See* Figure 14 below.

---

[93] Aff. of Brian M. Whitehurst at ¶ 34, *In the Matter of the Inquiry vs. iFinex Inc., et al.*, Index No. 450545/2019 (Apr. 25, 2019), NYSCEF No. 1.

[94] *See infra* 55; Figures 18-21.

**Figure 14 – Defendants' Manipulation of Bitcoin and Bitcoin Futures**



89.     During this time, Tether began employing a fractional reserve system wherein Tether held only a fraction of the U.S. dollar deposits backing USD₮ printing.  To artificially inflate Bitcoin prices, Tether routinely printed more USD₮s than required based on organic fiat currency deposits. This USD₮ was then transferred to the Bitfinex exchange and then to U.S.-based exchanges Bittrex and Poloniex to purchase Bitcoin.

90.     An anonymous statistical analysis, titled "Quantifying the Effect of Tether," analyzed the relationship between Bitcoin's prices and USD₮ and found that Tether was responsible for approximately 48.8% of Bitcoin's price increases in 2017 during the Bitcoin bubble.[95]  The report noted, "Tether printing moves the market appreciably; 48.8% of BTC's price rise in the period studied [December 25, 2016 through January 11, 2018] occurred in the two-hour periods following the arrival of 91 different Tether grants to the Bitfinex wallet."[96]

---

[95] *Quantifying the Effect of Tether*, Tether Report, at 6, http://www.tetherreport.com/slides.html (last visited Nov. 21, 2019).

[96] *Id.*

According to the report, "it is highly unlikely that Tether is growing through any organic business process, rather that they are printing in response to market conditions."[97]

91.    The suspect timing of Tether Limited's USD₮ issuances as it coincides with Bitcoin price increases is further supported by Tether's under-capitalization and admitted lack of a one-to-one reserve of U.S. dollars to USD₮s.

92.    Furthermore, finance professors John M. Griffin and Amin Shams at the University of Texas found that "purchases with Tether [USD₮] are timed following market downturns and result in sizable increases in Bitcoin prices.  The flow is attributable to one entity . . . suggests insufficient Tether reserves before month-ends."[98]  They found that "[t]he patterns observed above are consistent either with one large player purchasing Tether with cash at Bitfinex and then exchanging it for Bitcoin, or Tether being printed without cash backup and pushed out through Bitfinex in exchange for Bitcoin."[99]

93.    The effect of Tether printing USD₮ regardless of the underlying demand for USD₮ is at least three-fold.  First, Professors Griffin and Shams explained that USD₮ "increases the money supply in the crypto space" akin to "printing money," which "can significantly push cryptocurrency prices up by generating an artificial demand."[100]  Early cryptocurrency adopters who are long Bitcoin, such as Defendants, necessarily profit from inflating Bitcoin prices.

94.    Second, Professors Griffin and Shams noted that "the coordinated supply of Tether [USD₮] creates an opportunity to manipulate cryptocurrencies."[101]  Defendants and their co-conspirators could create USD₮s when Bitcoin prices are falling and in turn use the newly

---

[97] *Id.*

[98] Griffin & Shams, *supra* note 64, at 1.

[99] *Id.* at 7.

[100] *Id.* at 3.

[101] *Id.*

created USDŦ supply to artificially inflate Bitcoin prices.[102]  Once Bitcoin prices are artificially inflated, Defendants and their co-conspirators then sell Bitcoin back into USDŦ to replenish Tether Defendants' reserves.[103]  Professors Griffin and Shams explained that "[t]he issuers can stabilize and/or set regionalized price floors and push the price of Bitcoin and other cryptocurrencies upward."[104]

95.    Third, Professors Griffin and Shams noted that printing USDŦ without the underlying demand provides "the Tether issuers [] a valuable put option in the case of a future crypto market downturn or other losses."[105]  If, for example, Bitcoin prices decline significantly, Tether Defendants can default on redeeming USDŦ for dollars.[106]

96.    Professors Griffin and Shams concluded that "[p]rices in this [Bitcoin] market reflect much more than standard supply/demand and fundamental news.  These distortive effects, when unwound, could have a considerable negative impact on cryptocurrency prices."[107]

97.    Similarly, researchers from TokenAnalyst found that on days when Tether Defendants issued USDŦ, Bitcoin prices increased nearly 70% of the time.[108]

98.    During the Class Period, Defendants continued pumping up the price of Bitcoin at a rate exceeding any legitimate flow of customer funds, thus resulting in a rapid draining of Defendants' reserves and decreasing the ratio of USDŦ to fiat currencies.  Defendants' printing

---

[102] *Id.* at 3.

[103] *Id.* at 3.

[104] *Id.* at 17.

[105] *Id.*

[106] *Id.*

[107] *Id.* at 46-47.

[108] Matt Robinson & Matthew Leising, *Tether Used to Manipulate Price of Bitcoin During 2017 Peak: New Study*, Bloomberg (June 13, 2018), https://www.bloomberg.com/news/articles/2018-06-13/professor-who-rang-vix-alarm-says-tether-used-to-boost-bitcoin.

of additional USD₮ during the Class Period had an inflationary effect on the price of Bitcoin, akin to a government printing additional money.[109]

99.    Unlike other stablecoins, Tether maintains opaque banking and auditing relationships and does not disclose its banking relationships or submit its reserves to quarterly audits.[110]  In response to assertions that Tether Limited failed to maintain fiat currency reserves supporting a 1:1 valuation, Tether Limited published a memorandum from the accounting and advisory firm Friedman LLP (headquartered in New York) evidencing Tether Limited's sufficient reserve bank accounts as of September 15, 2017.[111]  While not an official audit, the report found that Tether Limited had issued 442,481,760 USD₮ and maintained USD reserves of $442,984,592.[112]  The results of Friedman LLP's report were published on September 28, 2017, and made available to all Bitfinex users, including those in the United States.

100.    On January 27, 2018, amid rising skepticism about Defendants' purported U.S. dollar reserves, Tether terminated its auditing relationship with Friedman LLP.[113]  On April 30, 2019, Tether disclosed through its counsel that Tether had backed only 74% of its then-outstanding $2.8 billion USD₮ market cap.[114]  Specifically, Tether stated that "cash and cash equivalents (short term securities) on hand totaling approximately $2.1 billion, representing approximately 74 percent of the current outstanding tethers."[115]  Tether further analogized its operations to a commercial bank's "fractional reserve" system, whereby the commercial bank

---

[109] *Tether: Fiat Currencies on the Bitcoin Blockchain*, *supra* note 10.

[110] Ehrlich, *supra* note 75.

[111] Friedman LLP, *Memorandum Regarding Consulting Services Performed*, Tether (Sept. 28, 2017), https://tether.to/wp-content/uploads/2017/09/Final-Tether-Consulting-Report-9-15-17_Redacted.pdf.

[112] *Id.* at 4-5.

[113] Wise, *supra* note 15.

[114] Aff. of Stuart Hoegner at ¶ 33, *In the Matter of the Inquiry vs. iFinex Inc., et al.*, Index No. 450545/2019 (Apr. 30, 2019), NYSCEF No. 24.

[115] *Id.*

maintains "a small fraction of customer deposits, deploying the rest via investments."[116]

101.    In effect, Tether maintained a license to print USD₮, which it routinely used to artificially inflate and manipulate the price of Bitcoin.  Reporting on Tether, *Medium* wrote:

> "If Tether was in fact able to issue tokens not backed by fiat reserves, then effectively they would be printing U.S. dollars in the cryptocurrency ecosystem," Wang Chu Wei, a researcher at the University of Queensland who has also studied Tether's impact on the cryptocurrency market, wrote in an email.  "If that was the case, Tether Limited's role/power would be not dissimilar to that of a central bank; i.e., the ability to increase money supply and boost asset prices."[117]

102.    Defendants' monopolization of USD₮ printing, and USD₮'s dominance in Bitcoin to stablecoin trading, enabled Defendants to manipulate Bitcoin prices and extract supra-competitive profits from Bitcoin traders.  Since Defendants were long Bitcoin, Defendants had a motive to artificially increase the price of Bitcoin in order to increase their profits.

103.    Moreover, Defendants were concurrently trading.   As Phil Potter explained, "add[ing] to [their] position a little bit on the way down and sell[ing] a little bit on the way up," prior to USD₮ issuances, Defendants were engaging in manipulative trading activities that harmed market participants.

104.    Bitcoin returns generally declined just before the USD₮ issuance dates and improved afterwards, forming a "U-shaped" pattern.  Defendants' purchases "on the way down," just prior to USD₮ issuances, would have resulted in supra-competitive gains.   Similarly, Defendants sales "on the way up," just after USD₮ issuances, would have resulted in supra-competitive gains.  *See*, *infra* Section V.A.

---

[116] *Id.* at ¶ 34.

[117] Wise, *supra* note 15.

### B.      Defendants Engaged in Wash Trades Through Intermediaries

105.    During the Class Period, Defendants collectively engaged in wash trading to give the appearance of liquidity and to solidify Bitfinex as the largest cryptocurrency exchange. Wash trading involves "entering into, or purporting to enter into, transactions to give the appearance that purchases and sales have been made, without incurring market risk or changing the trader's market position."[118]  Wash trading is a manipulative trading process that transmits artificial and misleading information to the market and gives the appearance of increased liquidity and trading volume.[119]

106.    In a live internet interview dated October 1, 2016, Chief Financial Officer Giancarlo Devasini admitted that in the weeks prior to October 2016, Bitfinex "was thinking about . . . pushing some wash sales in the system . . .[to] try to be number one again."[120] Giancarlo Devasini then stated that they decided "against allowing this [wash trading]" analogizing wash trading with "taking dope [drugs]," which Giancarlo Devasini acknowledged "was not a good thing to do."[121]  Despite Bitfinex's CEO's acknowledgment that wash trading was like "taking dope," Bitfinex had no mechanisms in place to prohibit wash trading.[122] Defendants and their co-conspirators collectively engaged in wash trading by directed purchases and sales through Bittrex and Poloniex, which in turn were cycled back to Bitfinex.

107.    Once Tether print USD₮s, they are transferred to Bitfinex, which then sends the USD₮ to U.S.-based cryptocurrency exchanges via known intermediary wallets for potential

---

[118] CFTC Glossary, CFTC https://www.cftc.gov/ConsumerProtection/EducationCenter/CFTCGlossary/glossary_wxyz.html.

[119] James Chen, *Wash Trading*, Investopedia (Apr. 23, 2019), https://www.investopedia.com/terms/w/washtrading.asp.

[120] Bitfinex'ed, *supra* note 83.

[121] Bitfinex'ed, *supra* note 83.

[122] Bitfinex'ed, *supra* note 83.

exchange for Bitcoin and other virtual currencies.  To trace the flow of newly printed USD₮s, Young constructed a mapping algorithm capable of identifying the "intermediary wallets" of those traders that sent USD₮s to U.S.-based cryptocurrency exchanges.

108.    A review of Tether's issuances demonstrates that most of the newly printed USD₮s between 2014 and 2018 were sent directly to Bitfinex via an intermediary wallet known as the "Tether Treasury."   Young's analysis identified that roughly $19 billion of USD₮ transactions, or approximately one-third (1/3) of all USD₮ transactions between October 2014, the date of Tether's first issuance, and May 2018 were sent to Bitfinex and then to U.S.-based exchanges such as Bittrex and Poloniex.

109.    Figure 15 below illustrates the flow of newly issued USD₮s to U.S. exchanges:

**Figure 15 – Flow of USD₮ from Tether to U.S.-based cryptocurrency exchanges[123]**



110.    The transaction data reveal that these wallets served only as intermediaries.  For example, the transaction data demonstrates that the Poloniex intermediary wallet sent USD₮s to only one wallet – the Poloniex exchange wallet.  Similarly, the Bittrex intermediary wallet sent USD₮s to only the Bittrex exchange.

---

[123] Huobi is a Singapore-based cryptocurrency exchange.

111.   In addition, Young's analysis of the USDT transaction data uncovered an additional intermediary wallet that circulated USDTs back from the U.S.-based cryptocurrency exchanges to Bitfinex, labeled "Recycling Wallet" in the above Figure 15.  The flows from the Recycling Wallet back to Bitfinex suggest that Bitfinex might have struggled to locate a purchaser for all USDTs that Bitfinex sent to various U.S.-based exchanges, and/or that Tether and its affiliates cashed out of existing Bitcoin positions using USDT as the fiat currency.  This suggests that Bitfinex used Poloniex, Bittrex, and Recycling Wallets to engage in wash trading to create artificial volume and maintain Bitfinex's position as the "number one" cryptocurrency exchange.

**Figure 16 – USDT Sent to U.S. exchanges by Intermediary Wallets Between October 2014 through May 2018**



112.   Between 2014 and 2018, Tether Limited issued approximately $3 billion in USDT.  Of that, Poloniex and Bittrex received approximately $2 billion (approximately 66% of all USDT issuances) from Bitfinex's known intermediary wallets.

113.   As demonstrated in Figures 15 and 16, Defendants affirmatively directed, through Bitfinex, approximately 66% of all USDT issuances between 2014 and 2018 through U.S.-based

exchanges Poloniex and Bittrex in furtherance of Defendants' and their co-conspirators' conspiracy to manipulate and artificially fix, suppress, or stabilize the price of Bitcoin on U.S.-based exchanges.

114.    Defendants' control of USD₮ issuances and Bitfinex permitted Defendants and their co-conspirators to coordinate purchases and sales with rising and falling Bitcoin prices. When Bitcoin prices were falling, Defendants and their co-conspirators printed USD₮s and artificially increased the price of Bitcoin.  Once Defendants and their co-conspirators artificially inflated the price of Bitcoin, Defendants and their co-conspirators then converted the Bitcoin back into USD₮s to replenish Tether's reserves.  In effect, the "Tether creators essentially have a put option to default on redeeming Tether, or to potentially experience a 'hack' where Tether or related dollars disappear."[124]

115.    While Bitfinex and Tether purported to maintain a one-to-one reserve of U.S. dollars to USD₮s, documents disclosed from the OAG reveal that Tether and Bitfinex failed to maintain a one-to-one reserve and faced extreme difficulty meeting client withdrawals.[125]

116.    Tether's inability to meet client withdrawals, coupled with Young's statistical evidence of the U-Shape of Bitcoin prices, strongly suggest that Defendants and their co-conspirators were not printing USD₮s based on client inflows of U.S. dollars, but rather that Defendants and their co-conspirators were artificially printing USD₮s to manipulate and artificially fix, suppress, or stabilize the price of Bitcoin.

---

[124] *Tether: Fiat Currencies on the Bitcoin Blockchain*, *supra* note 10.

[125] *See* Aff. of Brian M. Whitehurst at ¶¶ 62-71, *iFinex Inc.*, Index No. 450545/2019 (Apr. 25, 2019), NYSCEF No. 1.

### C.      Bitfinex and Tether Failed to Maintain Sufficient U.S. Reserves

117.      In 2018, the New York OAG commenced an investigation of Bitfinex and Tether. On November 27, 2018, the New York OAG served investigative subpoenas on Bitfinex and Tether alleging that Bitfinex and Tether lost approximately $851 million to a Panamanian entity called Crypto Capital Corp. ("Crypto Capital").

118.      On April 25, 2019, the New York OAG revealed that Tether comingled client and corporate funds and that approximately $851 million was unavailable.[126]  The Affirmation of Brian M. Whitehurst alleges that in 2014, Bitfinex began utilizing Crypto Capital as one of their "payment processors."[127]  According to the Whitehurst Affirmation, by 2018, Bitfinex had placed over $1 billion of comingled customer and corporate funds with Crypto Capital.  By the middle of 2018, Crypto Capital, which held all or nearly all of Bitfinex's funds, disallowed Bitfinex's clients' requests to withdrawal funds.[128]  By the middle of 2018, Bitfinex faced extreme difficulty meeting even small client withdrawals[129] because $851 million of funds held at Crypto Capital were seized by governmental authorities in Portugal, Poland, and the United States.[130]

119.      According to the Whitehurst Affirmation, for example, in August 2018, a senior executive at Bitfinex using the username Merlin ("Merlin"), believed to be Giancarlo Devasini,[131] wrote to their contact at Crypto Capital ("Oz") acknowledging that Tether lacked

---

[126] *Id.* at ¶ 68.

[127] *Id.*

[128] *Id.* at ¶ 62.

[129] *Id.*

[130] *Id.* at ¶ 68.

[131] Aff. of Brian M. Whitehurst at Ex. E, *In the Matter of the Inquiry vs. iFinex Inc., et al.*, Index No. 450545/2019 (N.Y. Sup. Ct., N.Y. County July 8, 2019), NYSCEF No. 86 (e-mail from Giancarlo Devasini noting that his "skype handle is Merlinmagoo" and that his "telegram is @Merlinthewizard.").

access to sufficient money to honor client withdrawals.  Consequently, Bitfinex faced extreme

difficulty honoring Bitfinex's clients' requests to liquidate USDŦ to U.S. dollars.

> **Merlin. [15.08.18 11:46]**
> Hey Oz, sorry to bother you every day, is there any way to move at least 100M to either
> [REDACTED]?  We are seeing massive withdrawals and we are not able to face them
> anymore unless we can transfer some money out of Cryptocapital
> **Merlin. [15.08.18 11:47]**
> I understand some of the funds are being held by [REDACTED], but what about the rest?
> **Merlin. [15.08.18 11:18]**
> under normal circumstances I wouldn't bother you (I never did so far) but this is a quite
> special situation and I need your help.  thanks[132]

120.    Similarly, in October 2018, Merlin again wrote to their contact at Crypto Capital

urging that Crypto Capital process withdrawals from Tether's cash reserves and warning that the

situation "could be extremely dangerous for everybody" and that "BTC [Bitcoin] could tank

below 1k" if Crypto Capital and Bitfinex did not act quickly.[133]

> **Merlin. [15.10.18 09:53]**
> I have been telling you since a while
> **Merlin. [15.10.18 09:53]**
> too many withdrawals waiting for a long time
> **Merlin [15.10.18 09:54]**
> is there any way we can get money from you?  Tether or any other form?  Apart with
> cryptocapital we are running low in cash reserves
> **Merlin [15.10.18 09:54]**
> please help
> **CCC [15.10.18 09:54]**
> I know.  We are following the banks we post as many as we can and let them process as
> much as possible according to them.  Everytime [sic] we push them they push back with
> account closure without reason
> **Merlin [15.10.18 09:55]**
> dozens of people are now waiting for a withdrawal out of cryptocapital
> **Merlin [15.10.18 10:01]**
> I need to provide customers with precise answer at this point, can't just kick the can a
> little more
> **Merlin [15.10.18 10:02]**
> the international I mean
> **CCC [15.10.18 10:02]**

---

[132] *Id.* at ¶ 63.

[133] *Id.* at ¶ 66.

I will keep you posted here
**CCC [15.10.18 10:02]**
On the process of all international payments.
**Merlin [15.10.18 10:02]**
please understand all this could be extremely dangerous for everybody, the entire crypto community
**Merlin [15.10.18 10:03]**
BTC could tank to below 1k if we don't act quickly[134]

121.    The above correspondence strongly evidences that Defendants knew that USD₮ printing and withdrawals moved in lockstep with the price of Bitcoin such that an increase in USD₮ withdrawals would significantly reduce the price of Bitcoin.  Merlin implored Crypto Capital to process withdrawals, and noted that the situation "could be extremely dangerous for everybody," on October 15, 2018, when the price of Bitcoin was $6,721.59 per Bitcoin.  Despite this high price, a Bitfinex employee was concerned that if withdrawals of USD₮ were not timely processed it could cause fear among market participants, potentially create a run on USD₮ withdrawal requests, and as a result, Bitcoin prices "could tank" approximately $5,721.59, or 85.1%, to under $1,000 per Bitcoin.[135]   Defendants' monopolization of USD₮ printing and USD₮'s dominance in Bitcoin ensured that Defendants controlled the price of Bitcoin through USD₮ printing and withdrawals.

122.    By early October 2018, numerous clients had reported the inability to withdraw funds from Bitfinex, which raised concerns online that Bitfinex was close to insolvency.[136]   In response, on October 7, 2018, Bitfinex released a notice to investors assuring them that Bitfinex was not insolvent and that the rumors were "a targeted campaign based on nothing but fiction."[137]   Bitfinex's notice further stated, "[b]oth fiat and cryptocurrency withdrawals are

---

[134] *Id.*

[135] *Id.*

[136] *Id.* at ¶ 64.

[137] *Id.* at ¶ 64.

functioning as normal.  Verified Bitfinex users can freely withdraw Euros, Japanese Yen, Pounds Sterling and U.S. Dollars.  Complications continue to exist for us in the domain of fiat transactions, as they do for most cryptocurrency-related organizations."[138]

123.    The following week Bitfinex released another notice to investors clarifying that, "[a]ll cryptocurrency and fiat withdrawals are, and have been, processing as usual without the slightest interference; [a]ll fiat (USD, GBP, JPY, EUR) withdrawals are processing, and have been, as usual; [f]iat deposits have been temporarily paused for certain user groups."[139]

124.    The New York OAG asserts that these statements from Bitfinex were untrue because documentation provided to the New York OAG demonstrates that during this time, Bitfinex faced extreme delay and difficulty processing client withdrawals.[140]

125.    Bitfinex's financial difficulties and lack of U.S. dollar reserves continued through at least the end of 2018.  For example, on October 18, 2018, Merlin again implored Crypto Capital to release funds noting that Bitfinex could not handle a relatively small withdrawal of $5 million.  Merlin wrote to his contact at Crypto Capital, "the situation looks bad, we have more than 500 withdrawals pending and they keep coming in."[141]  Merlin further noted, "we have about 400 small wires pending.  [T]he total amount is only 5M [$5 million], but we have to send them out quickly, people are enraged."[142]  Merlin elaborated, "too much money is trapped with you and we are currently walking on a very thin crust of ice."[143]

---

[138] Aff. of Brian M. Whitehurst at Ex. H, at 2-3, *In the Matter of the Inquiry vs. iFinex Inc., et al.*, Index No. 450545/2019 (Apr. 25, 2019), NYSCEF No. 13.

[139] Aff. of Brian M. Whitehurst at Ex. I, at 2, *In the Matter of the Inquiry vs. iFinex Inc., et al.*, Index No. 450545/2019 (Apr. 25, 2019), NYSCEF No. 14.

[140] Aff. of Brian M. Whitehurst at ¶ 66, *In the Matter of the Inquiry vs. iFinex Inc., et al.*, Index No. 450545/2019 (Apr. 25, 2019), NYSCEF No. 1.

[141] *Id.* at ¶ 67.

[142] *Id.*

[143] *Id.*

126.    The inability of Bitfinex to meet even $5 million in client withdrawals strongly suggests that, contrary to Tether's statements, Bitfinex did not maintain a one-to-one USDT to U.S. dollar reserve.   At no time did Bitfinex publicly disclose these serious financing and withdrawal issues.

127.    In an in-person meeting on February 21, 2019, counsel for Bitfinex and Tether explained to the New York OAG that they were in the process of discussing a "line of credit" to Bitfinex from Tether of $600 to $700 million on the reserve funds backing USDT in order to make up for the inaccessible $850 million at Crypto Capital.[144]   On March 29, 2019, counsel for Bitfinex and Tether informed the New York OAG that the "line of credit" transaction closed on or about March 19, 2019.[145]   The total amount of the "line of credit" as of March 29, 2019, was $700 million.[146]   As of July 2, 2019, Bitfinex still owed $600 million of the "line of credit" to Tether.[147]

128.    According to the Whitehurst Affirmation, counsel for Bitfinex and Tether articulated no benefit to Tether and asserted that that there was no apparent benefit to Tether, or holders of tether, from this transaction.[148]   Counsel for Bitfinex and Tether provided no indication that the transaction would be disclosed to the public.[149]

129.    The New York OAG has asserted that, despite Bitfinex's and Tether's claims that every USDT was backed by one U.S. dollar in its bank account, Tether had completely depleted

---

[144] *Id.* at ¶ 73.

[145] *Id.* at ¶ 85.

[146] *Id.*

[147] Philip Rosenstein, *Bitfinex Returns $100M to Tether Amid NY AG Proceeding*, Law360 (July 2, 2019, 8:42 p.m. EDT), https://www.law360.com/articles/1175142/bitfinex-returns-100m-to-tether-amid-ny-ag-proceeding.

[148] Aff. of Brian M. Whitehurst at ¶ 92, *In the Matter of the Inquiry vs. iFinex Inc., et al.*, Index No. 450545/2019 (Apr. 25, 2019), NYSCEF No. 1.

[149] *Id.* at ¶.73

its USD reserves.  The investigation also alleges that Bitfinex, which is owned and directed by the same individuals as Tether, was strapped for cash due to its relationship with Crypto Capital. Both of these allegations suggest that Defendants had the motivation to manipulate Bitcoin during the Class Period.

130.    In addition, during the Class Period, Tether invested some of its USD reserves into Bitcoin.  According to an attorney for Bitfinex, "Tether actually did invest in instruments beyond cash and cash equivalents, including bitcoin, they bought bitcoin."[150]  Similarly, Bitfinex CFO Giancarlo Devasini admitted that he has "over 1.2 million tokens" with "the vast majority of them on Bitfinex."[151]  Furthermore, Bitfinex Chief Strategy Officer Philip Potter admitted to "add[ing] to his position a little bit on the way down and sell[ing] a little bit on the way up."[152] Defendants' investments in Bitcoin provided a strong motivation to manipulate Bitcoin prices during the Class Period by front running purchases ahead of USD₮ issuances and front running sales after USD₮ issuances.

131.    Young's analysis demonstrates that in months that Tether Defendants issued USD₮, there were large, negative Bitcoin returns on the day preceding month-end as detailed below in Figure 17.  This strongly suggests that there were large liquidations of Bitcoin holdings on the day immediately preceding month-end during the months of USD₮ issuances.  Moreover, as Professors Griffin and Shams noted,[153] this observed pattern is consistent with Defendants replenishing Tether reserves by month-end by selling Bitcoin.  In addition, this effect is more pronounced in months with larger USD₮ issuances.

---

[150] John Isige, *Tether (USDT) admits to investing reserves in Bitcoin and "other assets,"* FXStreet (May 22, 2018 11:31 a.m. GMT), https://www.fxstreet.com/cryptocurrencies/news/tether-usdt-admits-to-investing-reserves-in-bitcoin-and-other-assets-201905221131.

[151] Bitfinex'ed, *supra* note 83.

[152] Coinspeaker Staff, *supra* note 81.

[153] Griffin & Shams, *supra* note 64, at 3-4.

**Figure 17 – Monthly USD₮ Issuances vs. Daily Bitcoin Returns on Day Preceding Month-End Between October 2015 and March 2018**



### III. ECONOMIC ANALYSIS SUPPORTS THE EXISTENCE OF DEFENDANTS' MANIPULATION

132.    Young's analysis demonstrates that Tether's USD₮ issuances coincided with a "U-shaped" pattern in Bitcoin prices, meaning that Bitcoin returns generally declined before USD₮ issuance dates and improved immediately after issuances.[154] This "U-shaped" pattern strongly suggests that Defendants used USD₮s to stabilize and/or to reverse falling Bitcoin prices between October 2014 and October 2019.  Figures 18 and 19 below demonstrate that the "U-shaped" results of Young's analysis of Bitcoin prices prior to and after USD₮ issuance prices are robust under a mean methodology.[155]

---

[154] According to a March 20, 2019, presentation from Bitwise Asset Management, Inc., a cryptocurrency consultancy and investment management firm, to the U.S. Securities and Exchange Commission, a large proportion of cryptocurrency trading volume amounts to "wash trading," meaning that entities associated with the exchanges are trading amongst themselves.  To address issues of "wash trading," Young's economic analysis used the market size and estimates for the Bitcoin market is sourced from exchange flagged as "clean" in the Bitwise report.  *See Presentation to the U.S. Securities and Exchange Commission*, Bitwise Asset Management (Mar. 19, 2019), https://www.sec.gov/comments/sr-nysearca-2019-01/srnysearca201901-5164833-183434.pdf.

[155] In 2017, there were multiple weeks where Tether Limited had multiple USDT issuances, sometimes on the same day.  To ensure that the "before" and "after" periods are comparable across issuance dates, Young clustered issuances that occurred within five (5) days of each other as a single issuance.

**Figure 18 – Mean Bitcoin Returns Before and After Issuance Dates (October 2014 – May 2018)**



133.    As demonstrated above in Figure 18, the mean return on Bitcoin was on a decreasing trend in the days immediately preceding Tether Defendants' USD₮ issuance. However, the mean return on Bitcoin reversed and the trend increased in the days following Tether Defendants' USD₮ issuance.  These results evidence the "U-shaped" pattern in Bitcoin prices, demonstrating a declining mean in Bitcoin returns prior to USD₮ issuance dates and an increasing mean in Bitcoin returns following issuances.

134.    Table 1 below further summarizes all USD₮ issuance dates, Bitcoin's returns prior to and after the USD₮ issuance, and whether Bitcoin's returns improved after the USD₮ issuance.

**Table 1 – Bitcoin Returns After USDŦ Issuance**

| Issuance Date | BTC Returns 5 Days Prior to Issuance | BTC Returns 5 Days after Issuance | Return Improvement After Issuance |
|---|---|---|---|
| 06/10/2014 | -17.17% | 9.76% | ✓ |
| 18/05/2015 | -1.79% | 2.46% | ✓ |
| 06/01/2016 | 0.32% | 4.50% | ✓ |
| 28/04/2016 | -0.24% | 0.29% | ✓ |
| 12/07/2016 | -4.38% | 2.24% | ✓ |
| 30/12/2016 | 8.31% | 20.13% | ✓ |
| 31/01/2017 | 2.09% | 5.87% | ✓ |
| 29/03/2017 | 0.82% | 9.98% | ✓ |
| 18/04/2017 | -0.54% | -0.37% | ✓ |
| 24/05/2017 | 7.90% | 18.10% | ✓ |
| 16/06/2017 | -16.39% | 6.77% | ✓ |
| 24/06/2017 | -7.83% | -1.80% | ✓ |
| 10/07/2017 | -7.10% | 17.75% | ✓ |
| 14/09/2017 | -8.19% | 24.41% | ✓ |
| 28/10/2017 | -3.79% | 23.04% | ✓ |
| 26/11/2017 | 17.63% | 61.63% | ✓ |
| 28/12/2017 | -0.63% | 3.72% | ✓ |
| 14/01/2018 | -2.30% | 8.45% | ✓ |

135.    The "U-shaped" pattern of Defendants' manipulation is particularly striking with respect to Tether's first USDŦ issuance on October 6, 2014.  In the five days prior to Tether's October 6, 2014 USDŦ issuance, Bitcoin prices fell 13.95%.  However, in the five days after Tether's issuance, Bitcoin's pricing trend reversed, and Bitcoin prices increased 9.76%.  *See* Figure 19 below.

49

**Figure 19 – Bitcoin Prices Before and After October 6, 2014 Issuance**



136. Similarly, the "U-shaped" pattern in Bitcoin as a result of Defendants' manipulation is particularly striking with respect to Tether's USD₮ issuance on January 6, 2016. In the five days prior to Tether's January 6, 2016 USD₮ issuance, Bitcoin prices fell 1.20%. However, in the five days after Tether's issuance, Bitcoin's pricing trend reversed, and Bitcoin prices increased 4.50%.  *See* Figure 20 below.

**Figure 20 – Bitcoin Prices Before and After Large Flows of USD₮ from Bitfinex to U.S. Exchanges on January 6, 2016**



137.    Defendants' concerted actions and manipulation of Bitcoin prices are further evident in Bitcoin's daily closing price before and after Tether's June 16, 2017 issuance.  Figure 21 below demonstrates that the price of Bitcoin decreased approximately 14.86% in the five days prior to Tether's June 16, 2017 issuance.  However, once Tether issued additional USD₮s on June 16, 2017, the price of Bitcoin reversed and increased 9.06% over the following five days.

**Figure 21 – Bitcoin Prices Before and After June 16, 2017 Issuance**



A.    **Economic Analysis of USD₮ Flows to U.S.-Based Cryptocurrency Exchanges Evidences "U-Shaped" Pattern**

138.    An analysis of the flow of Tether's newly issued USD₮s to the U.S.-based cryptocurrency exchanges further evidences that Defendants employed USD₮ issuances and flows to manipulate the price of Bitcoin and create a "U-shaped" pattern, thus enabling Defendants to enjoy supra-competitive profits.  In each of the examples below, Defendants intentionally carried out their conspiracy with U.S.-based customers through U.S.-based exchanges Bittrex and Poloniex.  Moreover, Defendants affirmatively knew and intended their manipulative and anticompetitive conduct to affect the price of Bitcoin traded in the United States at the expense of Plaintiff and class members.

139.    Specifically, Young analyzed the prices of Bitcoin in the seventy-two (72) hours before and after the largest 5% of newly issued USD₮ flows from Bitfinex to Bittrex and Poloniex.  Figure 22 below reveals a "U-shaped" pattern on an intraday level across the sample, consistent with the end-of-day results using the USD₮ issuance dates.

**Figure 22 – Normalized Average Bitcoin Intraday Prices Around Large Flows of USDT
from Bitfinex to U.S. exchanges between October 2014 and May 2018**



140.    The figure above provides strong economic evidence that Defendants, their co-conspirators, and John Does 1-50 sought to manipulate the price of Bitcoin through timed USDT issuances and through transaction flow of USDT to Bittrex and Poloniex.

141.    Moreover, an intraday analysis of Tether's newly issued USDTs and the subsequent flow reveal at least 236 potentially manipulative flow events.  Young developed an algorithm capable of mapping transactions between intermediary wallets and U.S. exchanges on the Tether blockchain.  Using this model, Young identified large flows[156] of USDT that followed negative Bitcoin returns for the prior twenty-four (24) hours, which are subsequently followed by positive Bitcoin returns (*i.e.*, a U-shaped pattern) after the USDT flows.  Table 2 below identifies the largest individual USDT flows and the pre and post Bitcoin returns.

---

[156] For the model, Plaintiff defined a "large" flow as a transfer greater than 200 Bitcoin equivalent in USDT.

**Table 2 - Reversal of Bitcoin Returns Following Large USD₮ Flows**

| Date and Time (UTC) | Hourly Flow Size (BTC Denominated) | BTC Return, Prior 24 Hours | BTC Return, Next 24 Hours |
|---|---|---|---|
| 13-Jun-2017 07:00 | 6226 | -6.4% | 0.7% |
| 15-Mar-2018 16:00 | 4136 | -4.2% | 5.6% |
| 10-Dec-2017 05:00 | 4107 | -11.5% | 20.5% |
| 04-Sep-2017 15:00 | 3916 | -5.6% | 3.4% |
| 25-Jun-2017 02:00 | 3372 | -5.7% | 0.3% |
| 19-Jun-2017 07:00 | 3352 | -1.0% | 1.8% |
| 27-May-2017 05:00 | 3027 | -12.3% | 2.7% |
| 27-Mar-2018 11:00 | 2930 | -2.6% | 0.7% |
| 16-Feb-2018 20:00 | 2906 | -0.8% | 7.7% |
| 08-Jun-2017 08:00 | 2784 | -1.8% | 1.0% |

142. In each example contained in Table 2, Defendants' issuance of USD₮ flowed directly to the United States, through Defendant Bitfinex to Defendants Bittrex and Poloniex. In each example, Defendants' issuance of USD₮ followed a period of negative Bitcoin returns; however, immediately following Defendants' issuance of USD₮, Bitcoin returns switched positive. For example, in the twenty-four (24) hours prior to December 10, 2017, Bitcoin prices declined approximately 11.5%. Defendants issued USD₮s equal to approximately 4,107 Bitcoin on December 10, 2017, and these transactions flowed through Defendants Bittrex and Poloniex. In the immediate twenty-four (24) hours after Defendants issuance, Bitcoin returned approximately 20.5%. As a result of Defendants and their co-conspirators' conduct, the price of Bitcoin was artificially inflated in the days following December 10, 2017.

143. Similarly, in the twenty-four (24) hours prior to September 4, 2017, Bitcoin prices declined approximately 5.6%. Defendants issued USD₮s equal to approximately 3,916 Bitcoin on September 4, 2017, and these transactions flowed through Bittrex and Poloniex. In the immediate twenty-four (24) hours after Defendants issuance, Bitcoin returned approximately 3.4%. As a result of Defendants and their co-conspirators conduct, the price of Bitcoin was artificially inflated in the days following September 4, 2017.

144.    As demonstrated through this example, Defendants and their co-conspirators intentionally directed their unlawful conduct at the United States at the expense of U.S. counterparties.   By directing the issuances through U.S.-based cryptocurrency exchanges, Defendants and their co-conspirators knew the consequences of their manipulation would be felt in the United States.

145.    In total, Young identified 236 large flow events on 115 days.   Each example contains the U-shaped pattern with negative Bitcoin returns in the immediate twenty-four hours prior to the USDŦ issuance and Bitcoin returns positive immediately after the USDŦ issuance. Table 3 below, sorted by the hourly flow size in Bitcoin-denominated USDŦ, identifies the USDŦ U-shaped issuances identified by Young's algorithm.

**Table 3 – U-Shaped Bitcoin Returns Following Large USD₮ Flows**

| Date and Time (UTC) | Hourly Flow Size (BTC Denominated) | BTC Return, Prior 24 Hours | BTC Return, Next 24 Hours |
|---|---|---|---|
| 13-Jun-2017 07:00 | 6226 | -6.4% | 0.7% |
| 15-Mar-2018 16:00 | 4136 | -4.2% | 5.6% |
| 10-Dec-2017 05:00 | 4107 | -11.5% | 20.5% |
| 04-Sep-2017 15:00 | 3916 | -5.6% | 3.4% |
| 25-Jun-2017 02:00 | 3372 | -5.7% | 0.3% |
| 19-Jun-2017 07:00 | 3352 | -1.0% | 1.8% |
| 27-May-2017 05:00 | 3027 | -12.3% | 2.7% |
| 27-Mar-2018 11:00 | 2930 | -2.6% | 0.7% |
| 16-Feb-2018 20:00 | 2906 | -0.8% | 7.7% |
| 08-Jun-2017 08:00 | 2784 | -1.8% | 1.0% |
| 05-Oct-2017 03:00 | 2670 | -1.5% | 2.2% |
| 19-Sep-2017 17:00 | 2624 | -0.1% | 0.6% |
| 26-Sep-2017 22:00 | 2561 | -0.8% | 7.2% |
| 22-Aug-2017 02:00 | 2102 | -5.5% | 7.3% |
| 17-Jan-2018 09:00 | 1767 | -8.6% | 7.7% |
| 04-Nov-2017 07:00 | 1420 | -1.4% | 3.1% |
| 19-Jan-2018 15:00 | 1395 | -3.3% | 9.0% |
| 28-Oct-2017 21:00 | 1287 | -0.3% | 8.1% |
| 27-Jun-2017 14:00 | 1181 | -5.8% | 9.4% |
| 19-Aug-2017 06:00 | 1112 | -5.2% | 0.3% |
| 04-Sep-2017 17:00 | 1077 | -7.4% | 3.5% |
| 15-Sep-2017 11:00 | 1047 | -18.8% | 18.1% |
| 06-Feb-2018 10:00 | 1025 | -16.2% | 26.9% |
| 13-Nov-2017 01:00 | 1023 | -5.2% | 12.9% |
| 17-Mar-2018 23:00 | 1010 | -4.8% | 4.2% |
| 21-Jun-2017 21:00 | 955 | -3.3% | 0.6% |
| 11-Feb-2018 23:00 | 899 | -5.7% | 10.2% |
| 30-Mar-2018 16:00 | 897 | -9.2% | 3.9% |
| 12-May-2018 16:00 | 839 | -2.6% | 3.2% |
| 01-Jul-2017 20:00 | 793 | -3.5% | 2.7% |
| 15-Mar-2018 17:00 | 789 | -2.2% | 3.7% |
| 14-Sep-2017 18:00 | 783 | -15.2% | 8.4% |
| 26-Jun-2017 20:00 | 766 | -6.5% | 3.4% |
| 18-Feb-2018 22:00 | 748 | -3.3% | 4.7% |
| 17-Jan-2018 23:00 | 746 | -4.1% | 0.1% |
| 05-Feb-2018 20:00 | 727 | -11.7% | 4.5% |
| 06-Feb-2018 08:00 | 719 | -21.7% | 25.0% |
| 19-Apr-2017 19:00 | 714 | -0.1% | 1.7% |
| 17-Jan-2018 08:00 | 703 | -11.1% | 0.4% |
| 23-Jan-2018 13:00 | 692 | -3.0% | 9.9% |

| Date and Time (UTC) | Hourly Flow Size (BTC Denominated) | BTC Return, Prior 24 Hours | BTC Return, Next  24 Hours |
|---|---|---|---|
| 08-Sep-2017 20:00 | 683 | -9.1% | 2.0% |
| 30-Mar-2018 01:00 | 678 | -14.1% | 2.4% |
| 27-Jun-2017 15:00 | 653 | -5.6% | 9.3% |
| 26-Jun-2017 21:00 | 640 | -5.4% | 4.0% |
| 07-May-2018 03:00 | 634 | -5.3% | 1.2% |
| 27-May-2017 06:00 | 629 | -17.2% | 3.7% |
| 12-May-2018 08:00 | 619 | -4.7% | 1.5% |
| 04-Sep-2017 18:00 | 612 | -9.7% | 6.5% |
| 08-Jul-2017 02:00 | 605 | -4.3% | 3.0% |
| 12-May-2018 06:00 | 584 | -7.6% | 0.9% |
| 07-Jan-2017 02:00 | 569 | -17.5% | 8.9% |
| 08-May-2018 14:00 | 565 | -4.7% | 1.5% |
| 04-Sep-2017 19:00 | 561 | -6.3% | 3.9% |
| 09-Feb-2018 08:00 | 546 | -1.9% | 7.4% |
| 12-May-2018 09:00 | 544 | -6.0% | 2.1% |
| 11-Feb-2018 12:00 | 542 | -4.0% | 5.7% |
| 27-Jun-2017 17:00 | 538 | -3.6% | 8.8% |
| 27-Jun-2017 08:00 | 537 | -4.7% | 5.9% |
| 27-May-2017 14:00 | 528 | -16.1% | 10.6% |
| 19-Sep-2017 20:00 | 522 | -2.8% | 1.4% |
| 29-Sep-2017 04:00 | 520 | -3.3% | 3.5% |
| 30-Mar-2018 22:00 | 517 | -2.3% | 0.3% |
| 02-Jul-2017 03:00 | 511 | -1.9% | 4.8% |
| 27-Jun-2017 07:00 | 505 | -2.3% | 3.1% |
| 10-Nov-2017 20:00 | 498 | -10.1% | 0.1% |
| 30-Mar-2018 23:00 | 492 | -5.6% | 2.6% |
| 21-Jun-2017 23:00 | 492 | -4.1% | 2.4% |
| 27-Jun-2017 00:00 | 488 | -3.8% | 5.6% |
| 14-Apr-2018 00:00 | 487 | -0.4% | 1.6% |
| 10-Apr-2018 00:00 | 483 | -3.7% | 1.2% |
| 08-Jul-2017 00:00 | 483 | -3.8% | 2.0% |
| 02-Feb-2018 07:00 | 467 | -15.4% | 1.5% |
| 14-Dec-2017 12:00 | 463 | -2.1% | 7.1% |
| 18-Nov-2017 00:00 | 462 | -4.0% | 1.9% |
| 04-Sep-2017 20:00 | 460 | -6.1% | 3.6% |
| 05-May-2017 20:00 | 454 | -0.1% | 1.7% |
| 24-Mar-2017 22:00 | 454 | -9.2% | 2.7% |
| 22-Feb-2018 13:00 | 443 | -7.8% | 3.2% |
| 17-Jan-2018 17:00 | 434 | -10.2% | 12.4% |
| 08-Sep-2017 22:00 | 426 | -9.6% | 2.4% |

| Date and Time (UTC) | Hourly Flow Size (BTC Denominated) | BTC Return, Prior 24 Hours | BTC Return, Next 24 Hours |
|---|---|---|---|
| 27-May-2017 11:00 | 426 | -23.7% | 15.3% |
| 18-Mar-2018 17:00 | 415 | -5.6% | 10.9% |
| 22-Sep-2017 12:00 | 408 | -8.3% | 7.2% |
| 15-Sep-2017 08:00 | 388 | -19.3% | 22.7% |
| 19-Mar-2017 03:00 | 382 | -5.6% | 3.8% |
| 22-Jan-2018 20:00 | 381 | -6.4% | 7.1% |
| 17-Jan-2018 20:00 | 380 | -0.6% | 7.4% |
| 19-Jul-2017 20:00 | 379 | -4.9% | 17.9% |
| 23-Apr-2018 10:00 | 375 | 0.0% | 4.2% |
| 18-Mar-2017 16:00 | 374 | -12.3% | 3.8% |
| 15-Aug-2017 15:00 | 369 | -8.4% | 5.4% |
| 09-Sep-2017 02:00 | 366 | -8.0% | 1.7% |
| 23-Nov-2017 20:00 | 365 | -0.2% | 0.4% |
| 15-Aug-2017 10:00 | 364 | -1.4% | 10.0% |
| 07-Jul-2017 16:00 | 363 | -2.5% | 0.2% |
| 27-May-2017 15:00 | 362 | -16.3% | 7.5% |
| 29-Sep-2017 03:00 | 359 | -2.5% | 3.9% |
| 19-Jul-2017 14:00 | 357 | -1.2% | 13.0% |
| 18-Jan-2018 05:00 | 356 | -0.1% | 2.8% |
| 27-May-2017 08:00 | 353 | -16.5% | 8.4% |
| 19-Jul-2017 19:00 | 352 | -1.9% | 15.1% |
| 22-Aug-2017 05:00 | 349 | -10.3% | 12.4% |
| 02-Apr-2018 02:00 | 349 | -1.0% | 1.5% |
| 16-Apr-2018 14:00 | 348 | -4.7% | 1.8% |
| 12-May-2018 17:00 | 347 | -3.6% | 4.0% |
| 11-Jul-2017 07:00 | 346 | -9.7% | 2.7% |
| 18-Apr-2018 14:00 | 346 | -0.1% | 1.7% |
| 18-Apr-2018 12:00 | 345 | -0.1% | 1.2% |
| 08-Sep-2017 21:00 | 344 | -7.7% | 1.3% |
| 27-May-2017 12:00 | 344 | -20.3% | 9.6% |
| 22-Jun-2017 10:00 | 343 | -0.8% | 0.7% |
| 15-Sep-2017 07:00 | 343 | -18.2% | 21.3% |
| 17-Sep-2017 08:00 | 334 | -7.8% | 11.9% |
| 01-Apr-2018 09:00 | 330 | -2.7% | 5.2% |
| 08-May-2018 13:00 | 328 | -2.2% | 1.6% |
| 16-Jun-2017 03:00 | 327 | -4.9% | 3.8% |
| 21-Jun-2017 22:00 | 322 | -5.3% | 3.4% |
| 16-Jul-2017 12:00 | 321 | -9.6% | 8.1% |
| 27-May-2017 13:00 | 321 | -17.5% | 9.3% |
| 16-May-2017 03:00 | 321 | -3.9% | 3.2% |

| Date and Time (UTC) | Hourly Flow Size (BTC Denominated) | BTC Return, Prior 24 Hours | BTC Return, Next 24 Hours |
|---|---|---|---|
| 14-Jan-2018 19:00 | 320 | -5.4% | -4.1% |
| 09-Mar-2018 16:00 | 318 | -7.8% | 8.0% |
| 19-Aug-2017 17:00 | 317 | -5.4% | 2.4% |
| 11-Jan-2018 04:00 | 317 | -7.3% | 3.0% |
| 16-Apr-2018 10:00 | 316 | -0.2% | 0.6% |
| 15-Sep-2017 00:00 | 312 | -16.2% | 14.5% |
| 16-Jul-2017 15:00 | 308 | -6.3% | 10.1% |
| 07-Jul-2017 15:00 | 308 | -3.2% | 1.2% |
| 12-Apr-2018 08:00 | 306 | -0.3% | 18.3% |
| 22-Jan-2018 22:00 | 306 | -4.8% | 3.4% |
| 18-Mar-2018 16:00 | 305 | -6.6% | 13.4% |
| 18-Feb-2018 10:00 | 305 | -1.4% | 3.8% |
| 02-Sep-2017 22:00 | 303 | -8.4% | 3.6% |
| 11-Jul-2017 15:00 | 302 | -1.1% | -0.0% |
| 12-May-2018 15:00 | 300 | -1.6% | 1.7% |
| 05-Feb-2018 19:00 | 300 | -19.2% | 13.0% |
| 14-Apr-2018 14:00 | 299 | -1.6% | 4.9% |
| 24-Dec-2017 02:00 | 298 | -5.8% | 0.2% |
| 14-Sep-2017 17:00 | 296 | -12.2% | 3.5% |
| 31-May-2017 01:00 | 295 | -1.0% | 4.2% |
| 19-Aug-2017 14:00 | 294 | -5.0% | 0.1% |
| 04-Nov-2017 12:00 | 291 | -1.7% | 5.1% |
| 08-Jul-2017 01:00 | 291 | -4.3% | 2.6% |
| 23-Nov-2017 11:00 | 287 | -1.7% | 1.2% |
| 01-Apr-2018 19:00 | 285 | -2.9% | 2.2% |
| 18-Apr-2018 10:00 | 283 | -0.6% | 1.6% |
| 16-Sep-2017 21:00 | 281 | -0.8% | 0.9% |
| 29-Sep-2017 06:00 | 280 | -4.8% | 5.1% |
| 07-Apr-2018 00:00 | 279 | -2.3% | 4.3% |
| 05-Sep-2017 01:00 | 279 | -8.1% | 6.6% |
| 19-Mar-2017 05:00 | 279 | -5.5% | 2.6% |
| 10-Jul-2017 22:00 | 278 | -7.8% | 0.3% |
| 23-Apr-2018 12:00 | 277 | 0.0% | 4.0% |
| 02-Jun-2017 09:00 | 275 | -0.4% | 3.0% |
| 01-Apr-2018 20:00 | 274 | -2.1% | 1.3% |
| 25-Oct-2017 03:00 | 272 | -4.1% | 6.6% |
| 08-Mar-2017 19:00 | 270 | -6.0% | 2.1% |
| 30-Nov-2017 21:00 | 266 | -4.9% | 12.4% |
| 05-Oct-2017 06:00 | 266 | -4.4% | 5.8% |
| 22-Jun-2017 07:00 | 266 | -2.0% | 2.4% |

| Date and Time (UTC) | Hourly Flow Size (BTC Denominated) | BTC Return, Prior 24 Hours | BTC Return, Next 24 Hours |
|---|---|---|---|
| 14-Jan-2018 19:00 | 320 | -5.4% | -4.1% |
| 09-Mar-2018 16:00 | 318 | -7.8% | 8.0% |
| 19-Aug-2017 17:00 | 317 | -5.4% | 2.4% |
| 11-Jan-2018 04:00 | 317 | -7.3% | 3.0% |
| 16-Apr-2018 10:00 | 316 | -0.2% | 0.6% |
| 15-Sep-2017 00:00 | 312 | -16.2% | 14.5% |
| 16-Jul-2017 15:00 | 308 | -6.3% | 10.1% |
| 07-Jul-2017 15:00 | 308 | -3.2% | 1.2% |
| 12-Apr-2018 08:00 | 306 | -0.3% | 18.3% |
| 22-Jan-2018 22:00 | 306 | -4.8% | 3.4% |
| 18-Mar-2018 16:00 | 305 | -6.6% | 13.4% |
| 18-Feb-2018 10:00 | 305 | -1.4% | 3.8% |
| 02-Sep-2017 22:00 | 303 | -8.4% | 3.6% |
| 11-Jul-2017 15:00 | 302 | -1.1% | 0.0% |
| 12-May-2018 15:00 | 300 | -1.6% | 1.7% |
| 05-Feb-2018 19:00 | 300 | -19.2% | 13.0% |
| 14-Apr-2018 14:00 | 299 | -1.6% | 4.9% |
| 24-Dec-2017 02:00 | 298 | -5.8% | 0.2% |
| 14-Sep-2017 17:00 | 296 | -12.2% | 3.5% |
| 31-May-2017 01:00 | 295 | -1.0% | 4.2% |
| 19-Aug-2017 14:00 | 294 | -5.0% | 0.1% |
| 04-Nov-2017 12:00 | 291 | -1.7% | 5.1% |
| 08-Jul-2017 01:00 | 291 | -4.3% | 2.6% |
| 23-Nov-2017 11:00 | 287 | -1.7% | 1.2% |
| 01-Apr-2018 19:00 | 285 | -2.9% | 2.2% |
| 18-Apr-2018 10:00 | 283 | -0.6% | 1.6% |
| 16-Sep-2017 21:00 | 281 | -0.8% | 0.9% |
| 29-Sep-2017 06:00 | 280 | -4.8% | 5.1% |
| 07-Apr-2018 00:00 | 279 | -2.3% | -4.3% |
| 05-Sep-2017 01:00 | 279 | -8.1% | 6.6% |
| 19-Mar-2017 05:00 | 279 | -5.5% | 2.6% |
| 10-Jul-2017 22:00 | 278 | -7.8% | 0.3% |
| 23-Apr-2018 12:00 | 277 | 0.0% | 4.0% |
| 02-Jun-2017 09:00 | 275 | -0.4% | 3.0% |
| 01-Apr-2018 20:00 | 274 | -2.1% | 1.3% |
| 25-Oct-2017 03:00 | 272 | -4.1% | 6.6% |
| 08-Mar-2017 19:00 | 270 | -6.0% | 2.1% |
| 30-Nov-2017 21:00 | 266 | -4.9% | 12.4% |
| 05-Oct-2017 06:00 | 266 | -4.4% | 5.8% |
| 22-Jun-2017 07:00 | 266 | -2.0% | 2.4% |

| Date and Time (UTC) | Hourly Flow Size (BTC Denominated) | BTC Return, Prior 24 Hours | BTC Return, Next  24 Hours |
|---|---|---|---|
| 18-Apr-2018 09:00 | 227 | -0.7% | 1.2% |
| 14-Jan-2018 12:00 | 225 | -7.8% | 6.9% |
| 01-Jul-2017 18:00 | 224 | -4.3% | 2.5% |
| 21-Jan-2018 09:00 | 223 | -6.3% | 0.3% |
| 22-Feb-2018 16:00 | 223 | -5.2% | 1.5% |
| 09-Sep-2017 18:00 | 222 | -1.4% | 0.9% |
| 22-Feb-2018 14:00 | 222 | -6.9% | 3.9% |
| 27-Jun-2017 05:00 | 221 | -3.1% | 2.2% |
| 11-Apr-2017 09:00 | 220 | 0.0% | 0.9% |
| 22-Apr-2018 04:00 | 220 | -0.4% | 0.6% |
| 22-Sep-2017 14:00 | 218 | -7.8% | 6.0% |
| 27-Jun-2017 01:00 | 218 | -4.4% | 4.0% |
| 29-Apr-2018 11:00 | 217 | -0.5% | 0.4% |
| 25-Oct-2017 20:00 | 216 | -0.6% | 4.4% |
| 09-Dec-2017 18:00 | 215 | -5.9% | 6.5% |
| 15-Aug-2017 14:00 | 214 | -6.6% | 3.9% |
| 01-Dec-2017 09:00 | 213 | -1.5% | 11.1% |
| 08-Sep-2017 23:00 | 213 | -7.0% | 0.8% |
| 01-Apr-2018 01:00 | 213 | -0.1% | 0.2% |
| 23-Feb-2018 01:00 | 213 | -8.7% | 6.4% |
| 22-Aug-2017 10:00 | 212 | -3.5% | 7.9% |
| 07-Apr-2018 01:00 | 212 | -2.5% | 4.9% |
| 04-Sep-2017 16:00 | 211 | -5.2% | 0.3% |
| 28-Apr-2017 23:00 | 210 | -1.6% | 2.1% |
| 07-Jul-2017 23:00 | 210 | -4.9% | 3.2% |
| 05-Sep-2017 09:00 | 208 | -3.8% | 9.2% |
| 13-Jun-2017 12:00 | 208 | -1.5% | 1.4% |
| 22-Jun-2017 08:00 | 207 | -2.4% | 2.2% |
| 04-Sep-2017 21:00 | 206 | -5.3% | 3.0% |
| 14-Sep-2017 16:00 | 206 | -7.9% | 5.7% |
| 19-Jan-2018 21:00 | 205 | -1.5% | 14.0% |
| 14-Sep-2017 19:00 | 205 | -12.5% | 5.2% |
| 08-Jan-2018 14:00 | 204 | -13.1% | 1.0% |
| 19-Mar-2017 00:00 | 201 | -9.0% | 3.8% |
| 11-Jul-2017 20:00 | 201 | -3.8% | 3.9% |
| 25-Sep-2017 02:00 | 200 | -2.5% | 6.8% |

146.    As a result of Defendants and their co-conspirators' conduct, Bitcoin returns improved after approximately 78% of all the USD₮ flow events as identified by Young's model. These results suggest that USD₮ issuances and flows are increasing demand for Bitcoin due to the subsequent increased transactions on U.S.-based cryptocurrency exchanges.

147.    Moreover, the Bitcoin returns across U.S.-based exchanges are highly correlated such that manipulation of Bitcoin prices in one exchange affected the price of Bitcoin across

competing exchanges.   Table 4 below demonstrates a strong statistical correlation in daily Bitcoin returns between various U.S.-based exchanges between 2016 and 2018.

**Table 4 - Correlation in Daily Bitcoin Returns Between U.S.-Based Cryptocurrency Exchanges Between January 2016 and December 2018**

|          | Bittrex | Coinbase | Gemini | Kraken |
|----------|---------|----------|--------|--------|
| Bittrex  | 1       |          |        |        |
| Coinbase | 86%     | 1        |        |        |
| Gemini   | 87%     | 99%      | 1      |        |
| Kraken   | 86%     | 98%      | 98%    | 1      |

148.   As illustrated in Table 4 above, there is approximately an 86% correlation between a change in the price of Bitcoin on Bittrex and the change in the price of Bitcoin on alternative exchanges, such as Coinbase and Gemini.   The strong correlation in Bitcoin returns means that Bitcoin prices run in parity, or lock-step, between the various exchanges.   In other words, any price movements in Bitcoin prices on Bittrex are immediately and correspondingly reflected in Bitcoin prices on other exchanges.

149.   Defendants' manipulative and anticompetitive conduct, targeted at Bittrex and Poloniex customers in the United States, had a corresponding and immediate impact on other U.S.-based exchanges, such as Coinbase, Gemini, and Kraken.   Defendants intentionally directed their unlawful conduct at the United States, which enabled Defendants and their co-conspirators to enjoy supra-competitive profits directly at the expense of U.S. market participants transacting in Bitcoin on other U.S.-based cryptocurrency exchanges.

## B.   CFTC and DOJ Investigations

150.   On November 20, 2018, the U.S. Department of Justice ("DOJ") launched a criminal investigation into Tether and Bitfinex, including whether the price of Bitcoin was being manipulated.   Bloomberg reported that, according to three people familiar with the DOJ's

investigation, the DOJ "recently homed in on suspicions that a tangled web involving Bitcoin, Tether and crypto exchange Bitfinex might have been used to illegally move prices."[157]

151.    Part of the DOJ's investigation examines whether the dramatic rise in USD₮s between 2016 and 2018 was "purely driven by actual demand, or was partially fanned on by market tricks."[158]    Prosecutors are also investigating whether Tether and/or Bitfinex employed illegal strategies, such as spoofing.[159]    According to those familiar with the investigation, the DOJ is examining how Tether issues new USD₮s and why those USD₮s predominantly enter the Bitcoin market through Bitfinex.[160]

152.    In addition to the DOJ investigation, Tether Limited and Bitfinex received subpoenas from the U.S. Commodity Futures Trading Commission ("CFTC") investigating the relationship between Tether Limited and Bitfinex and the purported reserves.[161]

153.    According to those familiar with the investigations, the DOJ and the CFTC are coordinating their examinations.[162]

---

[157] Matt Robinson & Tom Schoenberg, *Bitcoin-Rigging Criminal Probe Focused on Tie to Tether*, Bloomberg (Nov. 20, 2018, 4:00 a.m. EST), https://www.bloomberg.com/news/articles/2018-11-20/bitcoin-rigging-criminal-probe-is-said-to-focus-on-tie-to-tether.

[158] *Id.*

[159] *Id.*

[160] *Id.*

[161] Matthew Leising, *U.S. Regulators Subpoena Crypto Exchange Bitfinex, Tether*, Bloomberg (Jan. 30, 2018, 12:52 p.m. EST), https://www.bloomberg.com/news/articles/2018-01-30/crypto-exchange-bitfinex-tether-said-to-get-subpoenaed-by-cftc.

[162] Robinson & Schoenberg, *supra* note 156.

## IV.        MANIPULATION OF BITCOIN FUTURES

154.    Bitcoin futures have traded on the CME since December 2017.[163]  Similarly, Bitcoin futures have traded on the Cboe since December 2017.[164]  Traders of these contracts, which are important tools used by Bitcoin traders to hedge and manage risks associated with Bitcoin, were harmed by Defendants' monopolization and manipulation, which was directed at U.S.-based investors through Bittrex and Poloniex.

### A.        Bitcoin Futures Market

155.    A Bitcoin Futures contract is a standardized agreement to purchase or sell a participate asset at a predetermined date.  Trading in CME Bitcoin Futures is subject to the rules and regulations of the CME, namely Chapter 350 (Bitcoin futures) of the CME Rulebook.[165]  CME Bitcoin Futures are traded on the CME Globex electronic trading platform, and are cleared through CME ClearPort.[166]  Similarly, trading in Cboe Bitcoin Futures is subject to the rules and regulations of the Cboe, namely Chapter 13 (Cboe Bitcoin (USD) Futures Contract Specifications) of the Cboe Rulebook.[167]  Cboe Bitcoin Futures traded on the CBOEdirect all-electronic trading platform and were cleared by The Options Clearing Corporation.

---

[163] *CME Bitcoin Futures Frequently Asked Questions*, CME Group (Sept. 24, 2019), https://www.cmegroup.com/education/bitcoin/cme-bitcoin-futures-frequently-asked-questions.html.

[164] Evelyn Cheng, *Cboe announces bitcoin futures to start trading Sunday*, CNBC (Dec. 4, 2017, 8:33 a.m. EST), https://www.cnbc.com/2017/12/04/cboe-announces-it-will-launch-bitcoin-futures-on-dec-10.html.

[165] *CME Rulebook, Chapter 350*, CME Group, https://www.cmegroup.com/content/dam/cmegroup/rulebook/CME/IV/350/350.pdf (last visited Oct. 8, 2019).

[166] *CME Submission No. 17-417*, *supra* note 11.

[167] *Cboe Futures Exchange, LLC Rulebook,* Cboe Futures Exchange, LLC, Chapter 13 at 261, https://cfe.cboe.com/publish/cferulebook/cfe-rule-book.pdf (last updated Aug. 16, 2019).

### 1. CME Bitcoin Futures

156.    Chapter 350 of the CME Rulebook sets forth the rules for trading in CME Bitcoin Futures, including the contract specifications, trading specifications, and settlement procedures.[168]  The CME did not list options on CME Bitcoin Futures during the Class Period.[169]

157.    Each CME Bitcoin Futures contract is valued at 5 Bitcoins.[170]  The minimum tick size of the CME Bitcoin Futures contract is $5.00 per bitcoin, or $25.00 per contract.[171]

158.    CME Bitcoin Futures contracts are quarterly and trade for the following contract months: March, June, September, and December.[172]  During the Class Period, the CME listed four CME Bitcoin Futures contracts at a time – two consecutive quarters and the nearest two serial months.[173]  For example, in July 2019, the CME listed CME Bitcoin Futures contracts for July 2019, August 2019, September 2019, and December 2019.  Trading of CME Bitcoin Futures contracts continues until 4:00 p.m. London time on the last Friday of each contract month.[174]

159.    CME Bitcoin Futures are "cash" settled, meaning that contracts are financially settled based on the final mark-to-market by reference to the final settlement price.[175]  The final settlement price is equal to the CME CF Bitcoin Reference Rate ("BRR").  The BRR calculation is based on the Bitcoin trades between 3:00 p.m. and 4:00 p.m. London time reported by the

---

[168] *CME Rulebook, Chapter 350*, supra note 164.

[169] *CME Bitcoin Futures Frequently Asked Questions*, *supra* note 162.

[170] *CME Rulebook, Chapter 350*, *supra* note 164.

[171] *Id.*

[172] *Bitcoin Futures Contract Specs*, CME Group, https://www.cmegroup.com/trading/equity-index/us-index/bitcoin_contract_specifications.html (last visited Nov. 21, 2019).

[173] *Id.*

[174] *CME Rulebook, Chapter 350*, *supra* note 162.

[175] *CME Submission No. 17-417*, *supra* note 11.

following contributing constituent exchanges: Bitstamp, GDAX, itBit, and Kraken.[176]  The CME

describes the methodology of the BBR as follows:

> The [BRR] is calculated based on one hour of BTC:USD trades per day from 3:00
> p.m. to 4:00 p.m. London time …  (1) All Relevant Transactions are added to a
> joint list, recording the trade price and size for each transaction. (2) the list is
> partitioned into 12 equally-sized time intervals of 5 minutes each. (3) For each
> partition separately, the volume-weighted median trade price is calculated from
> trades submitted by each exchange. (4) The BRR is then calculated as the equally-
> weighted average of all partitions.[177]

160.    In 2018, the first full year of trading, market participants traded approximately

$31 billion worth of CME Bitcoin Futures contracts.  Figure 23 below depicts the trading volume

and price of CME Bitcoin Futures from December 2017 through May 2019.

**Figure 23 - CME Futures Price and Trading Volume**



161.    Similarly, since launching CME Bitcoin Futures, the daily open interest has

increased dramatically, which the CME stated "shows growing signs of institutional interest" in

---

[176] *Id.*

[177] *CME Bitcoin Futures Frequently Asked Questions*, *supra* note 162, at 5.

Bitcoin futures.[178]   According to the CME, open interest in CME Bitcoin Futures hit a new record on June 17, 2019.  Figure 24 below illustrates the steady linear increase in CME Bitcoin Futures open interest.

**Figure 24 - CME Bitcoin Futures Daily Open Interest Since Launch**



### 2.    Cboe Bitcoin Futures

162.    Chapter 13 of the Cboe Futures Exchange, LLC ("Cboe") Rulebook sets forth the rules for trading in Cboe Bitcoin Futures ("XBT"), including the contract specifications, trading specifications, and settlement procedures.[179]   The Cboe does not list options on Cboe Bitcoin Futures.

163.    Each Cboe Bitcoin Futures contract is 1 Bitcoin.[180]  The minimum tick size of the Cboe Bitcoin Futures contract is 5.00 points USD/XBT, or $5.00 per contract.[181]

---

[178] CME Group (@CMEGroup), Twitter, (June 18, 2019, 12:09 p.m.), https://twitter.com/CMEGroup/status/1141015074062110721.

[179] *Cboe Futures Exchange, LLC Rulebook*, *supra* note 166, at 261.

[180] *Id.*

[181] *Id.* at 264.

164.    During the Class Period, the Cboe offered three near-term serial months and up to three months on the March quarterly contract.[182]  For example, in January 2019, the Cboe listed Cboe Bitcoin Futures contracts for January 2019, February 2019, March 2019, and April 2019.[183]

165.    Trading of Cboe Bitcoin Futures contracts continues until 2:45 p.m. Chicago time on the final settlement date.[184]  The final settlement date for the serial and quarterly contracts was two business days prior to the third Friday of the contract month.[185]

166.    Cboe Bitcoin Futures are "cash" settled, meaning that contracts are financially settled based on the final mark-to-market by reference to the final settlement price.[186]  The final settlement price of Cboe Bitcoin Futures is calculated based on the U.S. dollar auction price of bitcoin on the Gemini Exchange.[187]  Specifically, the final settlement is based on Bitcoin prices, rounded to the nearest penny, at 4:00 p.m. Eastern time on the Gemini Exchange on the final settlement date.[188]

167.    In 2018, the first full year of trading, market participants traded approximately $9 billion worth of Cboe Bitcoin Futures contracts.  Figure 25 below depicts the trading volume and price of Cboe Bitcoin Futures from December 2017 through May 2019.

---

[182] *Id.* at 261.

[183] *Id.*

[184] *Id.*

[185] *Id.*

[186] *Id.* at 267-68.

[187] Andrew Lowenthal, *Cboe Futures Exchange, LLC Product Certification for Bitcoin Futures Submission Number CFE-2017-18*, Cboe, at 1 (Dec. 1, 2017), http://cfe.cboe.com/publish/CFErulefilings/SR-CFE-2017-018.pdf.

[188] *Id.*

**Figure 25 - Cboe Futures Price and Trading Volume**



168.    In March 2019, the Cboe discontinued Cboe Bitcoin Futures indicating that they would not issue additional Cboe Bitcoin Futures contracts after June 2019.[189]

**B.    Bitcoin Futures Prices are Inextricably Linked to the Price of Spot Bitcoin**

169.    The price of Bitcoin futures run in parity, or lockstep, with the spot price of Bitcoin traded on various Bitcoin exchanges.   Changes in the spot price of Bitcoin are immediately and correspondingly reflected in the price of Bitcoin futures.   Consequently, any manipulation of Bitcoin will invariably result in a direct corresponding manipulation in the price of Bitcoin futures.

---

[189] Alexander Osipovich, *Cboe Abandons Bitcoin Futures*, Wall Street Journal, (March 18, 2019, 9:00 a.m. ET) https://www.wsj.com/articles/cboe-abandons-bitcoin-futures-11552914001.

170.    Young's regression analysis demonstrates a strong, statistically significant relationship between changes in the spot price of Bitcoin and the front month CME and Cboe Bitcoin futures contracts.  Specifically, Figures 26 and 27 below depict the lockstep relationship between the prices of the front month Cboe Bitcoin Futures contract and Bitcoin from December 2017 through April 2019.  The analysis below demonstrates that Cboe Bitcoin front-month Futures contracts and Bitcoin are highly correlated, with a correlation coefficient generally exceeding 90%.

**Figure 26 - Correlation Between Bitcoin Spot and Cboe Futures**



171.    Young's analysis of the returns on Cboe futures and Bitcoin further demonstrates that Cboe futures and Bitcoin are highly correlated, with a correlation coefficient of 89%.

**Figure 27 - Correlation Between Returns on Bitcoin and Cboe Futures**



172.    In addition, Figures 28 and 29 below depict the lockstep relationship between the prices of the front month CME Bitcoin Futures contract and Bitcoin from December 2017 through April 2019.  The analysis below demonstrates that CME Bitcoin Futures contracts and Bitcoin are highly correlated with a correlation coefficient generally exceeding 90%.

**Figure 28 - Correlation Between Bitcoin Spot and CME Futures**



173.    Young's analysis of the returns on CME Bitcoin Futures and Bitcoin further demonstrates that CME Bitcoin Futures and Bitcoin are highly correlated, with a correlation coefficient of 87%.

**Figure 29 - Correlation Between Returns on Bitcoin and Cboe Futures**



174.    Moreover, the CME's submission to the CFTC asserted, "[s]tatistical analysis indicates that the BRR accurately reflects the underlying spot market."[190]  Further, according to the CME, "[t]he BRR reflects the value of one bitcoin in U.S. dollars."  As of December 1, 2017, the CME largest variation of the CME Bitcoin Futures daily settlement to the constituent exchanges' Bitcoin price has been 2.5%.[191]  In other words, according to the CME, the CME Bitcoin Futures daily settlement price has at least a 97.5% lockstep price correlation with the underlying constituent exchanges' price of Bitcoin.  The CME further acknowledges that market

---

[190] *CME Submission No. 17-417, supra* note 11, at 5.

[191] *Id.*

participants "can hedge Bitcoin exposure or harness its performance" using CME Bitcoin Futures.[192]

175.    Indeed, the Cboe's submission to the CFTC asserted that Cboe Bitcoin Futures contracts could be used to hedge Bitcoin.[193]  The Cboe stated, "XBT futures could be used by a number of different groups for commercial purposes, including by bitcoin miners to hedge production costs, bitcoin merchant processors to hedge inventories, merchants that accept bitcoin to hedge bitcoin inventories, and holders of bitcoin that wish to hedge their bitcoin holdings."[194]

176.    The inextricable link and lockstep pricing between Bitcoin futures and Bitcoin means any manipulation of the price of Bitcoin in either the spot or futures market by Defendants invariably distorts both the spot and futures market. Manipulation by Defendants in one market is quickly transmitted to the other market, resulting in artificial pricing in both.

### C.    Defendants Manipulated Bitcoin Futures

177.    The specifics of Defendants' Bitcoin futures trading activity are not public information since trading on the CME and Cboe is anonymous.  Defendants do not publicly disclose their specific trading activity; however, this information can be obtained through discovery from Defendants and third parties such as the CME and Cboe.

178.    Nevertheless, Young's analysis of Tether's issuances strongly suggests that Defendants, their co-conspirators, and John Does 1-50 monopolization and manipulation had an immediate and corresponding impact on CME Bitcoin Futures and Cboe Bitcoin Futures settlements.  Specifically, Young's analysis of USD₮ issuances demonstrates that same "U-shaped" pattern in CME Bitcoin Futures and Cboe Bitcoin Futures prices, meaning that CME

---

[192] *Now Available: Bitcoin Futures*, CME Group, https://www.cmegroup.com/trading/bitcoin-futures.html (last visited Oct. 8, 2019).

[193] Lowenthal, *supra* note 186, at 4.

[194] *Id.*

Bitcoin Futures and Cboe Bitcoin Futures returns generally declined before USD₮ issuance dates and improved immediately after issuances. This "U-shaped" pattern strongly suggest that Defendants used USD₮ to stabilize and/or to reverse falling Bitcoin prices between October 2014 and May 2018. Figures 30 and 31 below demonstrate that the "U-shaped" results of Young's analysis of CME Bitcoin Futures prices prior to and after USD₮ issuance prices are robust under a mean or median methodology.

**Figure 30 – Median CME Bitcoin Futures Returns Before and After Issuance Dates
(December 2017 – August 2019)**



179.   As illustrated above in Figure 30, the median price return prior to a USD₮ issuance is distinctly negative, meaning that CME Bitcoin Futures prices declined in the prior three days of a USD₮ issuance. However, on the day that Tether Defendants issue USD₮s, the pricing trend of CME Bitcoin Futures reverses from negative to positive and the median CME Bitcoin Futures prices increases. In the days following Tether Defendants' issuance of USD₮, the median CME Bitcoin Futures prices continued to decline.

**Figure 31 – Mean CME Bitcoin Futures Returns Before and After Issuance Dates
(December 2017 – August 2019)**



180.    As illustrated above in Figure 31, the mean price return prior to a USD₮ issuance is distinctly negative, meaning that CME Bitcoin Futures prices declined in the prior five days of a USD₮ issuance.  However, on the day that Tether Defendants issue USD₮s, the pricing trend of CME Bitcoin Futures reverses from negative to positive and the mean CME Bitcoin Futures prices increases.  In the days following Tether Defendants' issuance of USD₮, the mean CME Bitcoin Futures prices continued to decline.

181.    Figure 32 below demonstrate that the "U-shaped" results of Young's analysis of Cboe Bitcoin Futures prices prior to and after USD₮ issuance prices are robust under a median methodology.

**Figure 32 – Median Cboe Bitcoin Futures Returns Before and After Issuance Dates (December 2017 – August 2019)**



182.   As illustrated above in Figure 32, the median price return prior to a USD₮ issuance is distinctly negative, meaning that Cboe Bitcoin Futures prices declined in the prior days of a USD₮ issuance.  However, on the day that Tether Defendants issue USD₮s, the pricing trend of Cboe Bitcoin Futures reverses from negative to positive and the median Cboe Bitcoin Futures prices increases.  In the days following Tether Defendants' issuance of USD₮, the median Cboe Bitcoin Futures prices continued to decline.

183.   Since the underlying commodity to CME and Cboe Bitcoin futures is inextricably linked to the spot price of Bitcoin, Defendants necessarily and directly caused prices of the CME and Cboe Bitcoin futures to be artificial.  For example, Defendants' concerted actions and manipulation of Bitcoin prices are further evident in the change in prices in CME Bitcoin Futures and Cboe Bitcoin Futures prior to and after USD₮ issuances.  Prior to Tether's USD₮ issuance on December 28, 2017, the price of CME Bitcoin Futures and Cboe Bitcoin Futures declined; however, after Tether's USD₮ issuance, Bitcoin futures prices increased over the following five days.

**Figure 33 – Bitcoin Futures Prices Before and After December 28, 2017 USD₮ Issuance**



184.    Defendants and their co-conspirators' concerted actions and manipulation were also evident prior in the price changes prior to and after Tether's USD₮ issuance.  Prior to Tether's January 22, 2018 USD₮ issuance, CME Bitcoin Futures and Cboe Bitcoin Futures declined from approximately $14,000 per contract to approximately $10,500 per contract for an approximately 25% decline.  However, after Tether's USD₮ issuance, the price of CME Bitcoin Futures and Cboe Bitcoin Futures contracts stabilized and began to increase in the following days.

**Figure 34 – Bitcoin Futures Prices Before and After January 22, 2018 USD₮ Issuance**



185.     As a result of the significant correlation between Bitcoin and the CME and Cboe Bitcoin Futures, Defendants and their co-conspirators' manipulative conduct caused the prices of the CME and Cboe Bitcoin Futures to be artificial, which in turn harmed class members that sold at artificially low prices or purchased at artificially high prices.

## RELEVANT MARKET

186.     The relevant market in this case is the Bitcoin market, which comprises: (1) the Bitcoin market; and (2) CME Bitcoin Futures, Cboe Bitcoin Futures, and any other Bitcoin derivatives traded on a US-based futures exchange.

## CLASS ACTION ALLEGATIONS

187.     Plaintiff brings this action under Rules 23(a) and (b) of the Federal Rules of Civil Procedure on behalf of himself and all members of the following class:

> All persons, corporations, and other legal entities who transacted in (1) Bitcoin or (2) Bitcoin futures traded on the CME or Cboe, and made these transactions between October 1, 2014 and Present ("Class Period").  Excluded from the Class are Defendants, officers, directors, or employees of any Defendant; any entity in

78

which any Defendant has a controlling interest; any affiliate, legal representative, heir, assign, parent, subsidiary, or co-conspirator of any Defendant.

188.    The members of the Class are so numerous and geographically dispersed that joinder is impracticable.  There are at least hundreds of individuals and entities that transacted in Bitcoin and/or Bitcoin futures during the Class Period at prices that were artificially impacted by Defendants' wrongful conduct.  While the exact number of class members is unknown to Plaintiff, members of the Class are ascertainable from readily identifiable information and records in the possession of the CME, Cboe, or via third party exchanges.

189.    Plaintiff's claims are typical of the claims of the Class members.  Plaintiff and members of the Class were damaged by the same wrongful conduct of Defendants.

190.    Plaintiff will fairly and adequately protect and represent the interests of members of the Class.  The interests of Plaintiff are coincidental with, and not antagonistic to, those of members of the Class.  Plaintiff and all members of the Class are similarly affected by Defendants' course of conduct.

191.    Plaintiff is represented by sophisticated class action counsel with significant experience in the prosecution and leadership of complex antitrust and commodities  manipulation litigation.

192.    There are questions of law and fact common to all Class members, which predominate over questions that may affect only individual Class members.  Questions of law and fact common to Class members include, but are not limited to:

a.    whether Defendants and their co-conspirators engaged in a combination and conspiracy to fix, lower, maintain, stabilize and/or otherwise manipulate Bitcoin;

b.      whether Defendants and their co-conspirators engaged in a combination and conspiracy to fix, lower, maintain, stabilize and/or otherwise manipulate Bitcoin futures;

c.      the nature and duration of Defendants' manipulation of USD₮, Bitcoin, and Bitcoin futures in furtherance of the conspiracy;

d.      the identity of the participants of the alleged conspiracy;

e.      whether Defendants' manipulation of Bitcoin injected artificial prices into Bitcoin futures that traded on the CME and Cboe;

f.      whether Defendants' alleged conspiracy violated federal antitrust laws;

g.      whether Defendants' conduct violated Sections 2 of the Sherman Act and Section 4 of the Clayton Act;

h.      whether Defendants' conduct violated Sections 6(c)(3), 9(a) and 22 of the CEA;

i.      whether Defendants' conduct violated Sections 6(c)(1) and 22 of the CEA;

j.      whether Defendants acted to aid and abet violations of the CEA;

k.      whether John Doe Defendants' unlawful conduct caused cognizable legal injury under the CEA;

l.      whether Defendants' unlawful conduct caused Plaintiffs and Class members to suffer injury;

m.      whether Defendants and their co-conspirators fraudulently concealed their misconduct from Plaintiff and Class members; and

n.      the appropriate class-wide measure of relief for the Defendants' violations of the CEA and antitrust laws.

193.    Class action treatment is a superior method for the fair and efficient adjudication of this controversy because, among other things, such treatment will ensure that large numbers of similarly situated entities and individuals can prosecute their common claims in a single forum simultaneously, efficiently, and without the duplication of effort and expense that numerous individual actions would engender.  The benefits of proceeding through the class mechanism will also provide injured entities and individuals with a method for obtaining redress for claims that might not be practicable to pursue individually.

194.    The prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudication, establishing incompatible standards of conduct for Defendants.  Plaintiff is unaware of any special difficulty that is likely to be encountered in the management of this action that would preclude its maintenance as a class action.

195.    Plaintiff has defined the Class based on currently available information and expressly reserves the right to amend the definition of the Class, including, without limitation, the length of the Class Period.

## FRAUDULENT CONCEALMENT

196.    During the Class Period, Defendants actively, fraudulently, and effectively concealed their misconduct and manipulation of tether, Bitcoin, and Bitcoin futures, as alleged herein, from Plaintiff and members of the Class.  Defendants' conspiracy was inherently self-concealing and relied on secrecy for its successful operation.

197.    Had the public learned that Defendants printed USDŦs, self-traded, had insufficient reserves, could not withdraw, were in debt, created a Bitfinex loan to Defendants, and timed USDŦ issuances and Bitcoin transactions to artificially fix, depress, suppress, or

stabilize the price of Bitcoin, Defendants' conspiracy would not have continued for as long as it did.

198.    Consequently, Plaintiff could not, and thus did not, learn about Defendants' anticompetitive and manipulative conduct until recently.

199.    Reasonable due diligence could not have uncovered Defendants and their co-conspirators' manipulative conspiracy because of the opaque nature of Defendants' reserves and Defendants' unlawful activities were inherently self-concealing.

200.    Prior to March 2019, Tether repeatedly rejected concerns raised by market participants that Tether was not fully backed by a one-to-one reserve.  In response to rising concerns in 2017 from market participants that Tether failed to maintain a one-to-one reserve for USD₮s, Tether commissioned a report from the audit firm Friedman LLP confirming that Tether maintained a one-to-one reserve.[195]  These findings, which did not constitute an official audit, could have been interpreted by market participants as a signal that Defendants maintained a one-to-one reserve, and thus Defendants were not engaging in extraordinary issuances of USD₮s.

201.    As late as February 2019, Defendants continued to maintain that "[a]t any given time the balance of fiat currency held in our reserves will be equal to (or greater than) the number of tethers in circulation."[196]  Similarly, as late as February 19, 2019, Tether's own website proclaimed that USD₮ is "100% Backed" stating, "[e]very tether is always backed 1-to-1, by traditional currency held in our reserves.  So 1 USD₮ is always equivalent to 1 USD."[197] Defendants' repeated assurance that Tether maintained a one-to-one reserve for USD₮s provided

---

[195] *Memorandum Regarding Consulting Services Performed*, *supra* note 110.

[196] *Tether: Fiat currencies on the Bitcoin Blockchain*, *supra* note 10.

[197] *Tether*, WaybackMachine (Feb. 19, 2019), http://web.archive.org/web/20190219054619/https:/tether.to/.

further (incorrect) assurances to Plaintiff and class members that the concerns expressed by some market participants were unfounded.

202. On October 15, 2018, amid trading volatility and concerns about whether Defendants maintained sufficient reserves to maintain a one-to-one ratio, Leonardo Real, the Chief Compliance Officer of Tether, released a statement defending Tether Limited's reserves:

> Tether is the leading provider of tokenized fiat currencies and is listed on many exchanges worldwide. We would like to reiterate that although markets have shown temporary fluctuations in price, all USD₮ in circulation are sufficiently backed by U.S. dollars (USD) and that assets have always exceeded liabilities. In June 2018, a report from Freeh Sporkin & Sullivan, LLP (FSS), based on a random date balance inspection and a full review of relevant documentation of bank accounts, confirmed that all Tethers in circulation as of that date were indeed fully backed by USD reserves.[198]

203. The results of the report from Freeh Sporkin & Sullivan, LLP was published to market participants on June 20, 2018, and was available to all Bitfinex users including those in New York. Like many of the consultants Defendants employed to reassure U.S. investors, Freeh Sporkin & Sullivan, LLP is a U.S.-based law firm made up of three former federal judges. The report was designed to instill confidence in U.S investors.

204. On November 1, 2018, Tether Limited announced that it had established a banking relationship with Deltec Bank & Trust Limited ("Deltec").[199]   To further squash concerns that Tether failed to maintain a one-to-one reserve, Deltec sent Tether Limited a letter confirming "that, at the close of business on October 31, 2018, the portfolio cash value of your

---

[198] Omkar Godbole, *Price of 'Stable' Cryptocurrency Tether Tanks to 18-Month Low*, Coindesk (Oct. 16, 2018), https://www.coindesk.com/price-of-tether-stablecoin-tanks-to-18-month-low.

[199] *Tether Banking Relationship Announced*, Tether, https://tether.to/tether-banking-relationship-announced/ (last visited Nov. 21, 2019).

[Tether Limited] account with our bank was US$1,831,322,828."[200]   Tether Limited posted Deltec's letter, dated November 1, 2018, on Tether's website.[201]

205.   On December 18, 2018, Bloomberg News defended Tether's reserves releasing an article stating that Bloomberg News reviewed four separate months of bank statements provided by Tether evidencing that Tether maintained a one-to-one reserve.   Bloomberg News wrote, "[f]or example, one statement shows $2.2 billion was in Tether's account at Puerto Rico's Noble Bank Ltd. on Jan. 31.  That same day, 2.195 billion Tethers existed, according to data compiled by Coinmarketcap.com."[202]   Bloomberg News further stressed the validity of the banking statements noting, "[t]he statements were provided by someone with access to the company's records, and a government official confirmed their veracity."[203]   The article further noted that fears of skeptics, that Tether failed to maintain a one-to-one reserve, "may be unfounded."[204]

206.   After all these statements defending Defendants' U.S. dollar reserves as sufficient to maintain a one-to-one reserve, a person of ordinary intelligence would have believed that Defendants maintained a one-to-one reserve and were not engaging in any additional issuances of USD₮s or manipulation surrounding the timing the USD₮ issuances.   There was no information to the contrary until March 2019 when Tether Limited amended its prior description of USD₮ to state that USD₮ is "backed by our reserves."[205]   On April 30, 2019, Tether Limited

---

[200] *Letter from Deltec Bank & Trust Limited to Tether Limited*, Tether (Nov. 1, 2018), https://tether.to/wp-content/uploads/2018/11/Tether-Letter.pdf.

[201] *Tether Banking Relationship Announced*, *supra* note 198.

[202] Matthew Leising, *Crypto-Mystery Clues Suggest Tether Has the Billions it Promised*, Bloomberg News (Dec. 18, 2018), https://www.bloomberg.com/amp/news/articles/2018-12-18/crypto-mystery-clues-suggest-tether-has-the-billions-it-promised.

[203] *Id*.

[204] *Id*.

[205] *FAQs*, *supra* note 18.

disclosed through its counsel that Tether had backed only 74% of its then-outstanding $2.8 billion USD₮.[206]

207.   Defendants also fraudulently concealed their misconduct from Plaintiff, the Class, regulators, and the public through their own affirmative acts, including, among other things: (i) continually representing to maintain a one-to-one U.S. dollar reserve to USD₮s, thus misleading the public into believing that Defendants were not artificially printing USD₮s; (ii) maintaining the secrecy of Tether's issuances; and (iii) avoiding any discussion in public of the USD₮s issuances, Defendants' Bitcoin holdings, or Defendants' proprietary transactions.

208.   As a result of Defendants' fraudulent concealment, Plaintiff and the Class were not aware of Defendants' misconduct and were prevented from learning of the facts necessary to commence an action against Defendants for the wrongful conduct alleged in this Complaint until regulators publicly acknowledged their investigations of Defendants.  The facts necessary for Plaintiff to formulate the basis of a complaint and satisfy applicable pleading standards are within the exclusive control of Defendants, their co-conspirators, and the governmental regulatory authorities investigating the wrongful conduct alleged herein.

209.   Plaintiff and members of the Class have acted diligently in seeking to bring their claims promptly.  Because of Defendants' active steps, including fraudulent concealment of their conspiracy and the wrongful conduct alleged herein, Plaintiff asserts that the applicable statutes of limitations on Plaintiff's claims were tolled.  Defendants are also equitably estopped from asserting any statute of limitations defense.

210.   It was only after Young plaintiffs conducted their own sophisticated analysis, and after Tether Limited's April 30, 2019 disclosure that Tether backed only 74% of reserves and

---

[206] Aff. of Stuart Hoegner at ¶ 33, *In the Matter of the Inquiry vs. iFinex Inc., et al.*, Index No. 450545/2019 (Apr. 30, 2019), NYSCEF No. 24.

engaged in a fractional reserve system, that a person of ordinary intelligence would believe that Defendants were engaging in monopolization and manipulation of Bitcoin.  Given the multitude of statements in 2017 and 2018, Plaintiff and class members had no reason to suspect – at least until the April 30, 2019, disclosure through Tether Limited's counsel – that Defendants and their co-conspirators were knowingly employing a fractional reserve system, using USD₮'s issuances and trading to manipulate Bitcoin, and artificially impacting the price of CME and Cboe Bitcoin Futures contracts.  Indeed, as a result of Defendants' fraudulent concealment of pertinent information, there were no facts prior to April 30, 2019 to put Plaintiff and the Class on inquiry notice that a conspiracy to manipulation Bitcoin existed.

211.    Due to Defendants' fraudulent concealment of the conspiracy, any statute of limitations affecting or limiting the rights of action by Plaintiff or class members was tolled until April 30, 2019.

212.    The Defendants are equitably estopped from asserting that any otherwise applicable period of limitations has run.

## CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF
### VIOLATION OF THE SHERMAN ACT, 15 U.S.C. § 2
**(Against all Defendants and John Does 1-50)**

213.    Plaintiff incorporates the allegations in this Complaint by reference and reallege each preceding and succeeding paragraph as though fully set forth herein.

214.    In violation of Section 2 of the Sherman Act and Section 4 of the Clayton Act, during the Class Period, Defendants monopolized and conspired to monopolize the Bitcoin market.

215.    During the Class Period, Defendants engaged in excess issuances of USD₮, which were directed at U.S.-based traders through U.S.-based exchanges Bittrex and Poloniex and harmed futures traders on US-based exchanges.  As major market participants, Defendants, through USD₮, maintained a near-monopoly on trading with Bitcoin.

216.    Defendants and their un-named co-conspirators engaged in continued manipulation, understanding and conspiracy in an unreasonable and unlawful restraint of trade to allocate the market for, and artificially fix, depress, suppress, or stabilize the price of Bitcoin. This conduct had the effect of manipulating the prices of Bitcoin and Bitcoin futures contracts traded on the CME and CBOE.

217.    Approximately 70.00% of all total monthly Bitcoin volume that traded into fiat or stablecoin was executed using USD₮.  At all times, Defendants controlled the issuances, timing, and flow of issuances of USD₮.  The conduct consisted of a concerted effort between and among Defendants in furtherance of which they created artificial prices for Bitcoin and Bitcoin futures.

218.    Defendants used their market power to artificially fix, suppress, or stabilize the price of Bitcoin on U.S.-based cryptocurrency exchanges which also manipulated Bitcoin prices on domestic futures exchanges.

219.    Defendants' conduct and its resulting impact on Bitcoin market occurred in or affected interstate and international commerce.

220.    The anticompetitive effects of Defendants' conduct far outweighs any ostensible competitive benefits or justification.

221.    As a proximate result of Defendants and their un-named co-conspirators' anticompetitive conduct, Plaintiff and the Class have suffered injury to their business and property throughout the Class Period.  Plaintiff and members of the Class that traded Bitcoin

futures and other derivatives linked to the price of Bitcoin during the Class Period were deprived on normal, competitive trading patterns, and instead, were subjected to artificially determined prices as a result of Defendants' unlawful and manipulative conduct.

222.    Plaintiff and members of the Class are entitled to treble damages for Defendants' violations of the Sherman Act alleged herein, and a permanent injunction restraining Defendants and their un-named co-conspirators preventing and restraining further violations.

**SECOND CLAIM FOR RELIEF**
**MANIPULATION IN VIOLATION OF THE COMMODITY EXCHANGE ACT,**
**7 U.S.C. § 1, *ET SEQ.***
**(Alleged against all Defendants and John Does 1-50)**

223.    Plaintiff incorporates the allegations in this Complaint by reference and reallege each preceding and succeeding paragraph as though fully set forth herein.

224.    The CME and Cboe are designated by the CFTC as a contract market pursuant to Section 5 of the CEA, 7 U.S.C. § 7.  Both the CME and Cboe submit to the CFTC various rules and regulations for approval through which these exchanges design, create the terms of and conduct trading in Bitcoin futures.  The CME and Cboe are organized, centralized markets that provide a forum for trading on-exchange Bitcoin futures.

225.    During the Class Period, Defendants and their co-conspirators, through the conduct of John Does 1-50, as detailed in this Complaint, specifically intended to and did cause unlawful and artificial manipulation of Bitcoin, the commodity underlying the CME and Cboe Bitcoin futures, and understood and knew to a substantial certainty that manipulation of Bitcoin prices would have a direct and corresponding manipulative effect on CME and Cboe Bitcoin futures prices and would cause corresponding actual damage to class members.  The acts of manipulation described in this Complaint have no legitimate business purpose.

226.     Defendants and their co-conspirators, through their own conduct and the conduct

88

of John Does 1-50, had the ability to cause artificial prices in Bitcoin and Bitcoin futures. Defendants, their co-conspirators, and John Does 1-50 did so through, among other things, their dominant position in the Bitcoin market, their superior access to information, their financial wherewithal, and their extensive involvement in USDŦs and Bitcoin.

227.    Defendants, through their own conduct and the conduct of John Does 1-50, in fact caused artificial prices in the Bitcoin futures market.   Defendants' and John Does 1-50's misconduct caused prices of CME and Cboe futures to be artificial.

228.    Defendants, their co-conspirators, and John Does 1-50 activities alleged herein constitute unlawful manipulation of CME and Cboe Bitcoin futures and their underlying commodity in violation of Sections 6(c)(3), 7 U.S.C § 9(3), 9(a) of the CEA, 7 U.S.C. § 13(a), Section 22 of the CEA, 7 U.S.C. § 25(a), and CFTC Rule 180.2, 17 C.F.R. § 180.2.

229.    The manipulation by Defendants and their conspirators and agents, including John Does 1-50, deprived members of the Class of a lawfully operating market during the Class Period and caused them to transact at artificial prices which directly led to injury and economic damages.

230.    Class members are each entitled to actual damages for the violations of the CEA alleged herein.

### THIRD CLAIM FOR RELIEF
### MANIPULATIVE AND DECEPTIVE DEVICE
### IN VIOLATION OF THE COMMODITY EXCHANGE ACT, 7 U.S.C. §§1, *ET SEQ.* AND
### CFTC REGULATION 180.1(A), 17 C.F.R. §180.1(A)
### (Alleged Against All Defendants and John Does 1-50)

231.    Plaintiff incorporates the allegations in this Complaint by reference and reallege each preceding and succeeding paragraph as though fully set forth herein.

232.    By Defendants' intentional and reckless misconduct, Defendants each violated Section 6(c)(1) of the CEA, 7 U.S.C. § 9, Section 22 of the CEA (7 U.S.C. § 25), and Regulation

180.1(a), 17 C.F.R. § 180.1(a).  Defendants' misconduct caused prices of Bitcoin futures, and the prices of Bitcoin underlying the Bitcoin futures, to be artificial during the Class Period.

233.    Defendants, their co-conspirators, and John Does 1-50 intentionally or recklessly used or employed a manipulative device or artifice to defraud, and engaged in acts, practices, and/or courses of business which operated as a fraud or deceit upon any person, in connection with a sale or purchase of commodities in interstate commerce.  This conduct, among other things, included the making of untrue and misleading statements of material facts, or omitted material facts required to make the statements not misleading, such as:

(a)    making untrue statements about Tether's issuances of USDŦs;

(b)    making untrue statements about Defendants' U.S. dollar reserves;

(c)    failing to disclose, and omitting, that Defendants and John Does 1-50 engaged in transactions designed to manipulate the price of Bitcoin to benefit their own trading positions;

(d)    failing to disclose, and omitting, that Defendants and John Does 1-50 were unlawfully conspiring between and among themselves to manipulate the price of Bitcoin and Bitcoin futures; and

(e)    issuing statements and directly engaging in acts alleged herein knowingly or with reckless disregard for the truth.

234.    The manipulative and deceptive devices employed by Defendants and their conspirators and agents, including John Does 1-50, deprived members of the Class of a lawfully operating market during the Class Period and caused them to transact at artificial prices which directly led to injury and economic damages.

235.   Class members are each entitled to actual damages for the violations of the CEA alleged herein.

**FOURTH CLAIM FOR RELIEF**
**VICARIOUS LIABILITY FOR MANIPULATION OF BITCOIN FUTURES PRICES**
**IN VIOLATION OF THE COMMODITY EXCHANGE ACT,**
**7 U.S.C. § 2**
**(Alleged Against All Defendants and John Does 1-50)**

236.   Plaintiff incorporates the allegations in this Complaint by reference and reallege each preceding and succeeding paragraph as though fully set forth herein.

237.   Defendants, their co-conspirators, and John Does 1-50 are liable under Section 2(a)(1) of the CEA, 7 U.S.C. § 2(a)(1), for the manipulative acts of their agents, representatives and/or other persons acting for them.

**FIFTH CLAIM FOR RELIEF**
**AIDING AND ABETTING**
**IN VIOLATION OF THE COMMODITY EXCHANGE ACT,**
**7 U.S.C. §§ 1, *ET SEQ.***
**(Alleged Against All Defendants and John Does 1-50)**

238.   Plaintiff incorporates the allegations in this Complaint by reference and reallege each preceding and succeeding paragraph as though fully set forth herein.

239.   Defendants, their co-conspirators, and John Does 1-50 knowingly aided, abetted, counseled, induced and/or procured the violations of the CEA alleged herein.  Defendants, their co-conspirators, and John Does 1-50 did so knowing of other Defendants' manipulation of Bitcoin and Bitcoin futures and their violations of the CEA, and willfully intended to assist these manipulations to cause the prices of Bitcoin futures.   Through their aiding and abetting violations, Defendants, their co-conspirators, and John Does 1-50 violated Section 22(a)(1) of the CEA, 7 U.S.C. § 25(a)(1).

240.   Class members are each entitled to actual damages for the violations of the CEA alleged herein.

**SIXTH CLAIM FOR RELIEF**
**VIOLATION OF RACKETEER INFLUENCED AND CORRUPT ORGANIZATION**
**ACT (RICO), 18 U.S.C. §§ 1961, *ET SEQ.***
**(Alleged Against Defendants iFinex Inc., BFXNA Inc., BFXWW Inc., DigFinex Inc.,**
**Tether Holdings Limited, Tether Limited, Tether Operations Limited, and**
**Tether International Limited)**

241.    Plaintiff incorporates the allegations in this Complaint by reference and reallege each preceding and succeeding paragraph as though fully set forth herein.

242.    Defendants' collective association, including their participation together in issuing USD₮ and operating Bitfinex, constitutes a RICO enterprise in this case.  At all relevant times, Defendants, including the employees that conducted Defendants' affairs through illegal acts, knowingly and intentionally made false statements to U.S. Bitcoin investors and the public for the purpose of concealing Defendants' scheme.

243.    Every member of the enterprise participated, in concert, in the process of misrepresenting that USD₮ was backed by a 1:1 ratio by U.S. dollar reserves.  Defendants did so knowingly and intentionally for the purpose and with the effect of concealing Defendants' extraordinary printing of USD₮, which in turn Defendants used to manipulate prices of Bitcoin and Bitcoin futures.  Defendants earned millions, if not billions, of dollars in wrongful profits as a result of their enterprise, which they shared with employees who perpetrated the scheme.

244.    Throughout the Class Period, Defendants have knowingly, intentionally, or recklessly engaged in an ongoing pattern of racketeering under 18 U.S.C. § 1962(c) by committing the predicate acts of mail fraud (18 U.S.C. § 1341), wire fraud (18 U.S.C. § 1343), and bank fraud (18 U.S.C. § 1344(2)), by implementing the scheme to make false representations regarding whether USD₮ was backed by a 1:1 ratio by U.S. dollar reserves, which enabled Defendants to reap unlawful profits.  Defendants transmitted or caused to be transmitted by means of "wire communication in interstate or foreign commerce, . . . writings, signs, signals,

[and] pictures," "for the purpose of executing such scheme or artifice," including by: (i) transmitting false statements and representations regarding whether USDŦ was backed by a 1:1 ratio by U.S. dollar reserves; (ii) transmitting false statements regarding Tether Defendants' reserves; and (iii) transmitting e-mail communications relating to the process of determining, making, or transmitting false statements regarding Defendants' U.S. dollar reserves.

245.    Plaintiff is informed and believes that Defendants used the mail and wires in conjunction with reaching their agreement to falsely represent that USDŦ was backed by U.S. dollar reserves at a 1:1 ratio in order to further Defendants' manipulation of Bitcoin.   The racketeering scheme detailed above is based on Defendants' use of the internet and/or the mail across state lines.   These interstate channels to coordinate the scheme and transmit fraudulent statements to Plaintiff and members of the class satisfies RICO's requirement of an effect on interstate commerce.

246.    Through the racketeering scheme detailed above, Defendants use their enterprise to improperly and unlawfully increase their profits to the detriment of Plaintiff and members of the Class, who reside in differing states.

**SEVENTH CLAIM FOR RELIEF**
**UNJUST ENRICHMENT IN VIOLATION OF COMMON LAW**
**(Alleged Against All Defendants and John Does 1-50)**

247.    Plaintiff incorporates the allegations in this Complaint by reference and reallege each preceding and succeeding paragraph as though fully set forth herein.

248.    Rather than compete honestly, Defendants, their co-conspirators, and John Does 1-50 financially benefited through their unlawful acts, and it is unjust and inequitable for Defendants to have enriched themselves through unlawful means.

249.    Defendants, their co-conspirators, and John Does 1-50 enjoyed supra-competitive profits at the expense of Plaintiff and the class members and caused Plaintiff and the class

members to receive less profits than they otherwise would have received absent Defendants unlawful conduct.

250.    Commodities futures trading is a zero-sum game.  To the extent that Defendants, their co-conspirators, and John Does 1-50 benefits from their unlawful conduct, they necessarily did so at the expense of Plaintiff and members of the class.

251.    It is unjust and inequitable for Defendants, their co-conspirators, and John Does 1-50 to have enriched themselves in this matter at the expense of Plaintiff and the class members.

252.    Equity and good conscience require restitution by Defendants, their co-conspirators, and John Does 1-50.

253.    Each Defendant should pay restitution or its own unjust enrichment to Plaintiff and the class members.

254.    Plaintiff and class members are entitled to the establishment of a constructive trust impressed on the benefits to Defendants, their co-conspirators, and John Does 1-50 from their unjust enrichment and inequitable conduct.

## PRAYER FOR RELIEF

255.    Plaintiff, on behalf of himself and members of the Class, request relief as follows:

A.    That the Court determine that this action may be maintained as a class action under Rule 23(a) & (b) of the Federal Rules of Civil Procedure, that the Plaintiff be named as a Class Representatives of the Class, that the undersigned be named as Lead Class Counsel of the Class, and direct that notice of this action, as provided by Rule 23(c)(2) of the Federal Rules of Civil Procedure, be given to Class members;

B.    That the Court enter an order declaring that Defendants' actions, as set forth in this Complaint, violate the federal laws set forth above;

C.      That the Court award Plaintiff and members of the Class damages, treble damages, punitive damages, and/or restitution in an amount to be determined at trial;

D.      That the Court issue appropriate injunctive and other equitable relief against Defendants;

E.      That the Court award Plaintiff pre- and post-judgment interest;

F.      That the Court award Plaintiff their costs of suit, including reasonable attorneys' fees and expenses, including costs of consulting and testifying experts; and,

G.      That the Court award any and all such other relief as the Court may deem just and proper.

## JURY DEMAND

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiff respectfully demand a trial by jury on all matters so triable.

DATED: January 9, 2020

**GLANCY PRONGAY & MURRAY LLP**


By: */s/Gregory B. Linkh*
Gregory B. Linkh GL-0477
Brian P. Murray
Lee Albert (Pro Hac to be filed)\
230 Park Avenue, Suite 530
New York, NY 10169
Tel: (212) 682-5340
Fax: (212) 884-0988
glinkh@glancylaw.com
bmurray@glancylaw.com
lalbert@glancylaw.com